UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PHILLIP CARROLL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:19-cv-00224-JMS-TAB |
| BMW OF NORTH AMERICA, LLC, BAVARIAN MOTOR WORKS, | ) ) ) ) |
| Defendants. | ) |

# ORDER

Plaintiff Phillip Carroll purchased a BMW 7 Series (the "Vehicle") in 2010 for $107,808.40. On January 22, 2019, Mr. Carroll filed suit against Defendants BMW of North America, LLC ("BMW") and Bavarian Motor Works seeking damages related to the Vehicle's excessive consumption of engine oil and Defendants' failure to honor the terms of their warranty in violation of the Magnuson-Moss Warranty Act and various Indiana statutes. On March 12, 2019, BMW filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), and that Motion is now ripe for the Court's review.

## I.
### STANDARD OF REVIEW

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) is to test the sufficiency of the complaint, not to decide the merits of the case. Rule 12(b)(1) requires dismissal of claims over which the federal court lacks subject-matter jurisdiction. Jurisdiction is the "power to decide," *Boley v. Colvin*, 761 F.3d 803, 805 (7th Cir. 2014), and federal courts may only decide claims that fall within both a statutory grant of authority and the Constitution's limits on the judiciary. *In re Chicago, R.I. & P.R. Co.*, 794 F.2d 1182, 1188 (7th Cir. 1986).

While a court deciding a Rule 12(b)(1) motion may accept the truth of the allegations in the complaint, it should look beyond the complaint's jurisdictional allegations and view whatever evidence has been submitted on the issue to determine whether subject matter jurisdiction exists. *Ciarpaglini v. Norwood*, 817 F.3d 541, 543 (7th Cir. 2016). The party asserting the existence of subject matter jurisdiction bears the burden of demonstrating by competent proof that such jurisdiction in fact exists. *See Thomas v. Gaskill*, 315 U.S. 442, 446 (1942); *see also Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015). A Rule 12(b)(1) motion may be raised at any time, by either party or by the Court *sua sponte*. *See* Fed. R. Civ. P. 12(h).

## II.
### BACKGROUND

The following facts are drawn from Mr. Carroll's Complaint, [Filing No. 1], and are accepted as true for the purpose of resolving BMW's Motion.

On April 15, 2010, Phillip Carroll purchased the "Vehicle for $107,808.40 from one of Defendants' authorized dealers (the "Dealer"). [Filing No. 1 at 3.] When Mr. Carroll purchased the Vehicle, Defendants made representations as to its performance and quality and assured Mr. Carroll that the Vehicle was free from defects of workmanship. [Filing No. 1 at 4.] The Vehicle is equipped with a V8, twin-turbocharged engine, known as the N63 engine. [Filing No. 1 at 5.] At the time of purchase, the Vehicle's recommended oil service interval was the earlier of 15,000 miles or two years. [Filing No. 1 at 10.]

Within a few years of purchasing the Vehicle, Mr. Carroll observed that it consumed excessive engine oil. [Filing No. 1 at 3.] At some point during the warranty period, the "add oil" light illuminated on the Vehicle's dash, at which point Mr. Carroll notified the Dealer. [Filing No. 1 at 3.] In response, the Dealer told Mr. Carroll that it was normal for the Vehicle's high-performance engine to burn oil, and although the Dealer did not offer any repairs for the

Vehicle's excessive consumption of engine oil, the Dealer changed the Vehicle's oil at Mr. Carroll's request. [Filing No. 1 at 3.]

During the warranty period, Mr. Carroll took the Vehicle to the Dealer for an oil change every 3,000 miles or whenever the add oil light was illuminated, whichever occurred first. [Filing No. 1 at 4.] After the warranty period, Mr. Carroll added one quart of oil to the Vehicle every 1,100 miles and he now adds one quart of oil every 250 miles. [Filing No. 1 at 4.]

In September 2018, Mr. Carroll took the Vehicle to the Dealer, again complaining about its excessive oil consumption. [Filing No. 1 at 4.] The Dealer conducted an analysis and performed an oil change. [Filing No. 1 at 4.] Thereafter, Mr. Carroll drove the Vehicle 800 miles when smoke began emitting from the Vehicle's exhaust and the add oil light illuminated. [Filing No. 1 at 4.]

Since Mr. Carroll purchased the Vehicle, N63 engines have become widely known for consuming excessive amounts of engine oil and requiring frequent engine repairs. [Filing No. 1 at 6.] Defendants have issued several technical service bulletins to address complaints of excessive oil consumption and other problems related to the N63 engine, including one bulletin that instructed service technicians as follows:

> Engines equipped with a turbocharger(s) will consume more engine oil than normally aspirated engines (non-turbocharged). The additional oil that is consumed in a turbocharged engine is mainly due to the turbocharger lubrication requirements. . . . The additional engine oil consumption of a turbocharged engine, as compared to a normally aspirated engine, is normal and not a defect.

[Filing No. 1 at 7-9.]

On December 29, 2014, Defendants released a bulletin entitled "N63 Customer Care Package," which instructed service representatives to check the timing chain, fuel injectors, mass air flow sensors, crankcase vent lines, battery, engine vacuum pump, and low pressure fuel

sensor, and, if necessary, replace such parts on vehicles containing the N63 engine for free, even if no longer covered by the manufacturer's standard four-year/50,000 mile warranty." [Filing No. 1 at 11.]

In addition to the "N63 Customer Care Package," Defendants also launched the "N63 Customer Loyalty Offer" on December 29, 2014, which offered purchasers discounts on new BMW vehicles to replace their N63 vehicles. [Filing No. 1 at 11.] In addition, Defendants launched an "N63 Customer Appreciation Program," which authorized dealerships to provide purchasers with up to $50 of BMW merchandise or accessories. [Filing No. 1 at 11.]

Defendants learned of the oil consumption defect in or before 2008, via pre-release testing data, durability testing, early consumer complaints about the oil consumption defect, testing conducted in response to complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates, and from other internal sources. [Filing No. 1 at 12-13.]

By contrast, Mr. Carroll did not and could not have known that there was an oil consumption defect with the Vehicle's engine at the time that he purchased the Vehicle or any time thereafter. [Filing No. 1 at 14.]

On January 22, 2019, Mr. Carroll filed a complaint alleging the following: (1) a violation of the Magnuson-Moss Warranty Act (the "Magnuson-Moss Act") when Defendants "failed to remedy" the Vehicle's "oil consumption defect within a reasonable time, and/or a reasonable number of attempts," thereby breaching written and implied warranties, [Filing No. 1 at 16]; (2) a violation of the Magnuson-Moss Act and of Indiana Code § 26-1-2-314 when Defendants sold Mr. Carroll the Vehicle when it was not in merchantable condition, thereby breaching the implied warranty of merchantability, [Filing No. 1 at 16]; (3) a violation of Indiana Code § 26-1-

2-313 when Defendants refused "to repair the oil consumption defect" after Mr. Carroll submitted the Vehicle for repairs, thereby failing "to comply with the terms of the express written warranty," [Filing No. 1 at 17]; and (4) a violation of the Indiana Deceptive Consumer Sales Act when Defendants misrepresented that the Vehicle had "characteristics, uses, and/or benefits that it does not have," and failed to disclose information concerning the Vehicle that "was known at the time of its sale," in an effort to induce Mr. Carroll "into a purchase he would not have entered had the information been disclosed," [Filing No. 1 at 19].

On March 12, 2019, BMW filed a Motion to Dismiss Mr. Carroll's Complaint pursuant to Fed. R. Civ. P.12(B)(1), [Filing No. 12], and that Motion is now ripe for the Court's review.

### III.
#### DISCUSSION

BMW's argument in favor of its Motion to Dismiss is that Mr. Carroll's claims do not meet the $50,000 amount in controversy requirement under the Magnuson-Moss Act. [Filing No. 13 at 1-2.] BMW contends that the amount in controversy is determined by the "cost of cover," which it argues is "the price of the replacement vehicle, minus both present value of the allegedly defective car, and the value that the buyer received from use of that car." [Filing No. 13 at 2.] BMW points to a Seventh Circuit case in which the court held that even if a buyer could revoke acceptance of a vehicle and receive a refund for the purchase price, the seller would still be entitled to take possession of the car at the vehicle's present value and to be credited for the value that the buyer received from the use of the car while it was in the buyer's possession. [Filing No. 13 at 3 (citing *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402 (7th Cir. 2004)).] BMW argues that the Court must determine the amount in controversy by either strictly applying the formula in *Schimmer* ("replacement (or purchase price) of the vehicle minus present value of the allegedly defective car, minus an offset for the value of the usage of the vehicle by plaintiff") or

by slightly modifying the formula in *Schimmer* by merely subtracting the "value of offset for usage per Kelley Blue Book" from the purchase price. [Filing No. 13 at 4-5.] In this case, BMW argues that

- the Vehicle's purchase price was $107,808.40;
- at most, the Vehicle has a present value of $21,330; and as such,
- the value that Mr. Carroll received from driving the Vehicle for almost nine years is no less than $86,478. [Filing No. 13 at 4.]

Plugging those numbers into the formulas it previously set forth, BMW argues that the amount in controversy is $0 under *Schimmer* and $21,330 under the modified formula. BMW contends that both formulas demonstrate the "impossibility of a nearly nine-year-old car being able to establish the $50,000 jurisdictional limit" even if "Mr. Carroll [had] kept his 750Lxi on display at the Indianapolis Motor Speedway Museum behind a velvet rope for the last nine years," which he did not. [Filing No. 13 at 5.]

In response, Mr. Carroll argues that he has satisfied the amount in controversy under the Magnuson-Moss Act because he demands $50,000 in damages. [Filing No. 16 at 6.] Mr. Carroll argues that when a plaintiff relies on state law to support a Magnuson-Moss Act claim, courts must "look to state law to determine the remedies available, which in turn informs the potential amount in controversy." [Filing No. 16 at 5 (quoting *Schimmer*, 384 F.3d at 405).] Mr. Carroll therefore contends that damages should be measured according to Indiana law by determining any of the following: "(1) the cost of repair . . .; (2) the fair market value of the goods as warranted minus the salvage value; (3) the fair market value of the goods as warranted at the time of acceptance less the fair market value of the goods as accepted; and (4) the replacement costs less the value of the plaintiff's use of the good up to the time of trial." [Filing No. 16 at 5-6

(quoting *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1050 (Ind. Ct. App. 2009)).] In addition, Mr. Carroll argues that Indiana law allows for punitive damages "in an amount of up to three (3) times the amount of compensatory damages or $50,000, whichever is greater," and that punitive damages should be included in the amount in controversy for purposes of the Magnuson-Moss Act. [Filing No. 16 at 6.] Mr. Carroll contends that BMW's damages calculations are "nonsensical" and "flawed" because BMW "has not shown that under *all methods* of calculating [his] breach of warranty damages that the amount of controversy cannot be met to a legal certainty, nor has BMW taken into account [his] claim for punitive damages." [Filing No. 16 at 8.]

In its reply brief, BMW argues that "punitive damages are not available under Indiana law for a breach of warranty action." [Filing No. 18 at 2.] Further, BMW contends that "the proper way to calculate the 'amount in controversy' is by calculating the 'cost of cover', not by looking to state law." [Filing No. 18 at 4.]

The Court begins its analysis by turning to the statute at issue in this case: the Magnuson-Moss Act. The origins of the Act date back to the 1960s and 1970s, when Congress sought "to make warranties on consumer products more readily understood and enforceable." H.R. Rep. No. 93-1107 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7702, 7702. The House committee considering the legislation that would eventually become known as the Magnuson-Moss Act observed that in 1896, "the year marking the beginning of the American motor vehicle industry, thirteen cars of the same design were produced by an organized company," whereas by "1971, 75 years later over 8.5 million passenger cars were produced in the United States." *Id.* at 7705. At the same time, the proliferation of automobiles and other consumer goods was

accompanied by the growth of so-called "warranties." However, Congress observed that many warranties served to waive rather than enhance consumer protections:

> the paper with the filigree border bearing the bold caption 'Warranty' or 'Guarantee' was often of no greater worth than the paper it was printed on. Indeed, in many cases where a warranty or guarantee was ostensibly given the old saying applied 'The bold print giveth and the fine print taketh away.' For the paper operated to take away from the consumer the implied warranties of merchantability and fitness arising by operation of law leaving little in its stead.

*Id*. at 7706.

The Magnuson-Moss Act sought to address such issues by allowing "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract," to "bring suit for damages and other legal and equitable relief." 15 U.S.C.A. § 2310(d)(1). Built into the Act, however, was a jurisdictional limitation for filing suit in federal court: "[n]o claim shall be cognizable in a suit . . . if the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit." 15 U.S.C. § 2310(d)(3)(B).

The amount in controversy for the purposes of the Magnuson-Moss Act is the only issue before the Court at this time. In determining the amount in controversy, this Court must give Mr. Carroll "the benefit of the doubt, for '[i]t must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.'" *Gardynski-Leschuck v. Ford Motor Co.*, 142 F.3d 955, 957 (7th Cir. 1998) (quoting *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)); *see also Schultz v. Gen. R.V. Ctr.*, 512 F.3d 754, 756 (6th Cir. 2008) (citations omitted) (applying the "legal certainty test" in the context of the Magnuson-Moss Act's amount in controversy requirement and stating that it is "well-settled" that "if a plaintiff brings an action in federal court and a defendant seeks dismissal on amount-in-controversy

grounds, the case will not be dismissed unless it appears that the plaintiff's assertion of the amount in controversy was made in bad faith").

> A. *Whether it Appears to a Legal Certainty that Mr. Carroll's Claim is Less Than $50,000 under* Schimmer v. Jaguar Cars, Inc.

Defendant first argues that the "amount in controversy clearly does not exceed $50,000 to any legal probability," [Filing No. 13 at 5], under the formula set forth by the Seventh Circuit in *Schimmer v. Jaguar Cars, Inc.*, in which the purchaser of a Jaguar automobile revoked his acceptance one year after paying over $69,000 for the car and filed suit two years later. 384 F.3d 402, 403 (7th Cir. 2004). After observing that no full warranty existed in the case, the Court noted that the Magnuson-Moss Act also "allows consumers to enforce written and implied warranties in federal court, borrowing state law causes of action." *Id.* at 405 (citing *Gardynski–Leschuck*, 142 F.3d at 956). In such a case, the Seventh Circuit stated that federal courts must "look to state law to determine the remedies available, which in turn informs the potential amount in controversy." *Id.* at 405 (citations omitted). Turning to Illinois law, the *Schimmer* court observed that even if state law allowed a refund of the $69,513.00 purchase price, "the amount in controversy, that is, [the buyer's] true damages, could not exceed $50,000" because then the car company "would be entitled to re-take possession of the car (now worth only $54,013.00 . . . ) [and] would also be entitled to a credit for the value [the buyer] received from his use of the car while it was in his possession." *Id.* at 405. Applying this formula to the case before it, the Seventh Circuit stated as follows:

> the cost of a replacement vehicle ($69,513.00) minus the present value of the defective car ($54,013.00) yields $15,500.00. To complete the formula, this $15,500.00 figure must be further reduced by the value that [the buyer] obtained from his use of the [vehicle]. Although we have no way of knowing what this figure might be, even if it is $0.00, the maximum [the buyer] could recover (and the maximum loss to Jaguar) under Illinois law would be $15,500.00.

*Id*. at 406. Because the amount in controversy was less than $50,000, the Seventh Circuit stated that the case must be dismissed for lack of subject matter jurisdiction. *Id*. at 406.

BMW uses the formula set forth in *Schimmer* but takes the analysis a step further by coming up with its own way to evaluate the value that Mr. Carroll received from driving the Vehicle from 2010 to the day he filed this case in 2019. BMW calculates this amount by deducting the current Kelley Bluebook Value of the Vehicle from the purchase price. But *Schimmer* says nothing at all about how to evaluate the value a buyer receives from owning a car. To the contrary, the Seventh Circuit specifically stated in *Schimmer* that it would have "no way of knowing what this figure might be." 384 F.3d at 406. And unlike in *Schimmer*, where subtracting the present value of the vehicle from the purchase price by itself mandated dismissal, here, subtracting the present value of the defective vehicle from the purchase price does not, even under the most generous valuation of the Vehicle, equal less than $50,000.

Accordingly, the formula in *Schimmer* does not provide grounds for dismissal because it does not allow the Court to conclude to a legal certainty that the claims at issue in this case fall below the $50,000 jurisdictional amount set forth in the Magnuson-Moss Act.

> B. *Whether it Appears to a Legal Certainty that Mr. Carroll's Claim is Less Than $50,000 because* Miller Brewing Co. v. Best Beers of Bloomington, Inc. *Bars Punitive Damages for Breach of Warranty*

The Court next considers BMW's argument that the amount in controversy does not exceed $50,000 because "punitive damages are not available under Indiana law for a breach of warranty action." [Filing No. 18 at 1.] BMW's argument is based on an Indiana Supreme Court case providing that there is a "general rule that punitive damages are not allowed in a breach of contract action" and that "no exception exists." [Filing No. 18 at 2 (quoting *Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608 N.E.2d 975, 981 (Ind. 1993)).]

The problem with BMW's argument on this point is that it has provided no authority indicating that *Miller Brewing Company* applies to breach of warranty actions. Contrary to BMW's implicit suggestion that they are the same, in 2000, the Indiana Court of Appeals observed that causes of action for breach of contract and for breach of warranty "are different." *Zawistoski v. Gene B. Glick Co.*, 727 N.E.2d 790, 792 (Ind. Ct. App. 2000). Citing a prior Court of Appeals decision, the *Zawistoski* Court explained: "Although closely related, the two actions are not identical. A warranty is a promise, usually collateral to the principal contract, although not necessarily so." *Id*. at 792 (quoting *Nelson v. Marchand*, 691 N.E.2d 1264, 1271 n. 8 (Ind. Ct. App. 1998)); *see also M.E.M. Ventures, LLC v. White Grp., Inc.*, 2019 WL 1242915, at *4 (N.D. Ind. Mar. 18, 2019) (holding that a plaintiff's "breach of contract claims, as distinct from any breach of warranty claims, are time-barred"). Nothing in *Miller Brewing Company* indicates that it applies to breach of warranty claims, nor does any subsequent Indiana case mandate such a finding.

Accordingly, *Miller Brewing Company* does not provide grounds for dismissal because it does not allow the Court to conclude to a legal certainty that the claims at issue in this case fall below the $50,000 jurisdictional amount set forth in the Magnuson-Moss Act.

### IV.
#### Conclusion

For the reasons set forth herein, the Court cannot conclude to a legal certainty that Mr. Carroll's claims fall below the $50,000 jurisdictional amount set forth in the Magnuson-Moss Act and the Court therefore concludes that the complaint sets forth causes of action that could plausibly reach the $50,000 threshold. As such, BMW's Motion to Dismiss Mr. Carroll's Complaint pursuant to Fed. R. Civ. P.12(B)(1), [12], is **DENIED**.

Date: 5/9/2019

_____
Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**<u>Distribution via ECF only to all counsel of record.</u>**