## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| Phillip Carroll, | : |
| | : |
| Plaintiff, | : Civil Action No.: 1:19-cv-00224-JMS-TAB |
| vs. | : |
| | : |
| BMW of North America, LLC and Bavarian | : **FIRST AMENDED COMPLAINT AND** |
| Motor Works, | : **DEMAND FOR JURY TRIAL** |
| | : |
| Defendants. | : |
| | : |
| | : |

For this First Amended Complaint, Plaintiff[1] Phillip Carroll, by undersigned counsel, states as follows:

### PRELIMINARY STATEMENT

1.     This is an action by the purchaser of a vehicle (hereafter the "subject vehicle") manufactured and sold by the Defendants BMW of North America, LLC and Bavarian Motor Works.  Plaintiff seeks damages related to his vehicle's excessive consumption of engine oil and Defendants' failure to honor the terms of their warranty.

2.     Plaintiff would not have purchased the subject vehicle had he been made aware of the subject vehicle's defective engine.

### JURISDICTION AND VENUE

3.     This Court has jurisdiction over this matter pursuant to the Magnuson-Moss Federal Act, 15 U.S.C. § 2310(d)(1)(B), in that the Plaintiff claims more than $50,000.00 in damages, exclusive of interest and costs, and under the doctrine of supplemental jurisdiction as set forth in 28 U.S.C. § 1367.

---

[1]Additional Plaintiffs may be added at a later date.

4.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) as Defendants are subject to personal jurisdiction in this District and where Defendants, as principals, direct and control warranty repairs on covered vehicles through its agents consisting of a dealership network located in this District.

5.      Further, venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the Plaintiff's claims occurred within this District.

**PARTIES**

6.      Plaintiff was, at all relevant times, an adult individual residing in Indianapolis and who purchased a motor vehicle in Indiana which was manufactured or sold by Defendants.

7.      Defendant BMW of North America, LLC ("BMW-NA") is organized under the laws of Delaware with its principal place of business located at 300 Chestnut Ridge Road, Woodcliff, New Jersey.  BMW-NA was created in 1975 to act as the United States importer of BMW luxury and performance vehicles, which were traditionally manufactured in Munich, Germany.  At all relevant times, BMW was engaged in the business of importing, assembling, marketing, distributing, and warranting BMW automobiles in the State of Indiana and throughout the United States.

8.      Defendant Bavarian Motor Works ("BMW-GER") is a corporation organized and existing under the laws of Germany, with its principal place of business located in Munich, Bavaria, Germany.  BMW-GER is the parent corporation of BMW of North America, LLC.

2

9.    BMW-NA and BMW-GER sell BMW vehicles through a network of independently owned dealerships across the United States that are agents of BMW-NA and BMW-GER.

## FACTUAL ALLEGATIONS

10.    Plaintiff Phillip Carroll (hereafter "P. Carroll") is an adult individual residing in Indianapolis, Indiana.

11.    On or about April 15 2010, P. Carroll purchased a new 2010 BMW 7 Series 750Lxi, Vehicle Identification Number WBAKC8C50AC430274 (hereafter the "P. Carroll Vehicle") from Bill DeFouw BMW, an authorized dealer of the Defendants.

12.    The purchase price of the Vehicle was $107,808.40 including options, fees, taxes, and finance charges.

13.    Within a couple of years after purchasing the P. Carroll Vehicle, P. Carroll observed that it consumed an excessive amount of engine oil which required him to add oil throughout the warranty period and well before the Defendants' recommended oil change intervals.

14.    On one occasion, when the add oil light was illuminated on the dash of the P. Carroll Vehicle (which was during the warranty period), P. Carroll spoke to a Service Manager of DeFouw BMW, an authorized dealer of the Defendants, since the subject vehicle was not due for an oil change.

15.    In response, the Service Manager told P. Carroll it was normal for the vehicle's high performance engine to burn oil.  Accordingly, the dealer did not offer any repairs for the vehicle's excessive consumption of engine oil but did change the oil at P. Carroll's request.

16.     Thereafter, P. Carroll had to take the subject vehicle into the dealer for an oil change every 3,000 miles or whenever the add oil light was illuminated, whichever occurred first.  At no time did the dealer disclose to P. Carroll that the excessive oil consumption in his vehicle was due result of a defect covered under the manufacturer's warranty.

17.     After the warranty expired, the P. Carroll Vehicle's excessive oil consumption got progressively worse to the point where P. Carroll would have to add one quart of oil every 1,100 miles and currently has to add one quart of oil every 250 miles.

18.     When P. Carroll complained again around September 2018 to an authorized dealer regarding the subject vehicle's excessive oil consumption, the dealer performed an analysis and oil change.

19.     After the "analysis" and oil change, P. Carroll drove the subject vehicle for about 800 miles when it began emitting smoke from the exhaust and the add oil light was illuminated again.

20.     As a result of the P. Carroll Vehicle's excessive consumption of engine oil, P. Carroll had to add engine oil to the P. Carroll Vehicle in between the Defendants' recommended oil change intervals in order to prevent the vehicle's engine from failing.

21.     Defendants manufactured and placed into the stream of commerce the aforementioned vehicle (the subject vehicle), which the Plaintiff subsequently purchased.

22.     At the time Plaintiff purchased the subject vehicle, Defendants made representations as to the subject vehicle's performance and quality and assured the Plaintiff that the subject vehicle was free from defects of workmanship.

23.     Prior to purchasing his vehicle, Plaintiff relied upon Defendants' representations regarding Defendants' New Vehicle Limited Warranty that accompanied the

sale of his vehicle, including the representation that Defendants would repair their vehicle's engine; these representations were material to Plaintiff's decision to purchase his vehicle.

24.     Specifically, under its New Vehicle Limited Warranty, Defendants promised to repair or replace components found to be defective in material or workmanship during the 4-year / 50,000-mile following such vehicle delivery to consumer.

25.     Defendants authorized dealers expressly assented to perform warranty repairs on the subject vehicle, necessary to bring Defendants in compliance with the Defendants' express warranty.

26.     Defendants control the execution of all warranty repairs by their dealers, as they provide training, materials, special tools, diagnostic software, and replacement parts to their dealers, and demand that the warranty repairs be performed in strict accordance with their repair guidelines, Technical Service Bulletins, and other instructions.

27.     In return, Defendants pay their authorized dealerships monetary compensation for such warranty repairs.

28.     Therefore, Defendants' authorized dealers are agents for purpose of vehicle repairs, and knowledge of a defect reported to any such dealer can be imputed to Defendants.

29.     After purchasing his vehicle, Plaintiff discovered that, unbeknownst to him, the subject vehicle's engine contains a manufacturing defect which causes the subject vehicle to consume engine oil at an extremely rapid rate.

30.     Moreover, Plaintiff discovered that as a result of the subject vehicle's above-described defect, Plaintiff was required to regularly add additional engine oil to his vehicle in between the Defendants' recommended oil change intervals in order to prevent his vehicle's engine from failing and suffering from other related damage.

31.     In 2008, BMW introduced a new V8, twin-turbocharged engine, which BMW and enthusiasts refer to as the "N63."  This large, high-performance engine was designed to be BMW's next generation V8 and was placed in certain BMW 5 Series, 6 Series, 7 Series, X5, and X6 vehicles from the 2009 through 2014 model years.

32.     Upon information and belief, the N63 engine was included on the V8 versions of the following BMW vehicles:

> F01 and F02 (7 Series Sedan) – produced from 3/2009 to 6/2012
> F04 (Active Hybrid 7) – produced from 4/2010 to 6/2012
> F07 (Gran Turismo) – produced from 9/2009 to 6/2012
> F10 (5 Series Sedan) – produced from 3/2010 to 7/2013
> F12 (6 Series Convertible) – produced from 3/2011 to 7/2012
> F13 (6 Series Coupe) – produced from 7/2011 to 7/2012
> E70 (X5) – produced from 3/2010 to 6/2013
> E71 (X6) – produced from 7/2008 to 6/2014
> E72 (ActiveHybrid X6) – produced from 9/2009 to 9/2011

26.     The subject vehicle is equipped with the N63 engine.

27.     The N63 has become widely known and described as defective throughout the automotive industry and the BMW-enthusiast community.  It is widely recognized that N63 engines consume excessive amounts of engine oil and require frequent engine repairs, especially as compared to other, similar vehicles not containing N63 engines.

33.     Some owners and enthusiasts blame the oil consumption on BMW's decision to place the N63's twin-turbochargers between the cylinder heads, and inside of the engine V, rather than outside of the engine V, away from sensitive components, where turbochargers are typically located.

34.     N63 vehicles are notorious for consuming excessive amounts of engine oil and frequently need additional engine oil between scheduled oil changes to prevent catastrophic engine damage or failure.

35.     The oil consumption defect was particularly apparent in a recent Consumer Reports study on excessive oil consumption.  Consumer Reports studied 498,900 vehicles across several makes and models for complaints about engine oil consumption and concluded that BMW's N63 engine was included on four out of the five most defective vehicles. (http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

36.     The V8 version of the BMW 5 Series, which contained the N63 engine in 2011, 2012, and 2013 model years, was the worst performer in the study with 43 percent of vehicles needing an additional quart of oil between oil changes as of 2015. BMW's 6 Series and 7 Series, many of which contained the N63 engine, are the next worst performers. Finally, the V8 version of the X5 was the fifth worst performer in the study.

37.     The Consumer Reports study also shows that a greater percentage of defective models start to consume oil as they age.  This means that large numbers of N63 owners will begin to experience the oil consumption defect in the near future if they have not already.

38.     Many purchasers of vehicles containing the N63 engine have become upset about the excessive engine oil consumption – which was not disclosed by BMW in the product literature – and have posted internet complaints about specific frustrations and hassles caused by the oil consumption defect.

39.     For example, one N63 purchaser started a thread entitled, "Excessive oil consumption" on a BMW enthusiast website in November 2011:

> So I'm starting to get a little irritated at how much oil my 550 is burning. In the last 6k I've had to add 1 quart of oil three times.  In other words it is burning a quart every 2000 miles.  I've read about some people posting about having to add oil before but this much?? I've never owned a new car that burned any oil much less at this rate. Anyone else having this issue?  Oh btw the car has

9120 miles and I put 3100 in Europe during my ED.  When I was to have redelivery I had the dealer do an oil change and was gonna change the oil every 7.5k.

(http://www.bimmerfest.com/forums/showthread.php?t=581072.)

40.    A fellow BMW enthusiast responded with four separate links about the oil consumption issue and explained that the defect "was a hot topic back in September" 2011. (*Id.*)

41.    An Internet search of "N63 AND Burning Oil" reveals thousands of similar complaints regarding the oil consumption defect.[2]

42.    BMW had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs since the defect poses an unreasonable safety hazard, and because BMW had exclusive knowledge or access to material facts about N63 vehicles and engines, not known or reasonably discoverable by consumers. Defendants, however, failed to disclose the defect to consumers prior to or at the time of purchase or lease.

43.    The oil consumption defect has become so problematic that BMW has issued several technical service bulletins ("TSBs") to address complaints of excessive oil consumption and other problems related to the N63 engine.[3]

44.    With regard to the oil consumption issue, BMW issued the following TSBs:

NHTSA ID Number: 10046859

Service Bulletin Number: SIB-11-08-12
Summary: DUE TO DAMAGED SEAL RING, DURING ASSEMBLY, ENGINE OIL IS LEAKING FROM ENGINE OIL PUMP VOLUME CONTROL VALVE GASKET SEAL RING.

---

[2] See, e.g., http://www.bimmerfest.com/forums/showthread.php?t=581072 (last visited Mar. 21, 2016); http://www.e90post.com/forums/showthread.php?t=874786 (last visited Mar. 21, 2016).
[3] TSBs are recommended repairs issued by automotive manufacturers and directed only to automotive dealers. TSBs are frequently issued when a manufacturer receives widespread reports of a particular problem with its vehicles.

MODELS E70, E71, F01, F02, F04, F07, F10, F12, F13. NO MODEL
YEARS LISTED.

_____

NHTSA ID Number: 10045282
Service Bulletin Number: SIB-11-07-12
Summary: BMW: WHILE DRIVING VEHICLE, AT TIMES
WOULD BE ROUGH RUNNING; WHITE OR BLUE SMOKE
SEEN EXITING EXHAUST SYSTEM AND THE ENGINE OIL IS
CONSUMED ABOVE SPECIFICATIONS.

45.    In June 2013, BMW issued SIB-11-01-13, which took the extraordinary step of changing engine oil consumption specifications for N63 vehicles, and specifically instructed service technicians to add two quarts of engine oil to N63 vehicles when the vehicles instruct owners to add only one additional quart of oil.

(http://www.xbimmers.com/forums/showthread.php?p=14449679.)

46.    Instead of addressing the underlying cause of excessive oil consumption in order to attempt to fix the defect, BMW recommended that its service technicians simply add more engine oil to respond to consumer complaints. Technicians were instructed to add two quarts of engine oil when the vehicles electronic system specifically called for one additional quart and to also add an additional quart as the default fill on N63 vehicles. While BMW did not address the underlying problem, it likely reduced the number of complaints because the engine oil level in the subject vehicles would now be overfilled, a condition that can cause the engine oil to become aeriated, resulting in potential oil starvation and reduced oil pressure.

47.    Technical Service Bulletin SIB-11-03-13 appears to be part of a campaign to conceal the oil consumption defect and represent it as a normal feature of BMW vehicles. To this effect, BMW issued SIB-11-03-13, which upon information and belief includes the following:

Service Bulletin Number: SIB-11-03-13

Summary: All engines normally consume a certain amount of engine oil. This is necessary in order to properly lubricate the cylinder walls, pistons, piston rings, valves and turbocharger(s), if equipped. In addition, engines with less than 6,000 miles will generally consume additional engine oil because the internal engine components are not fully seated (break-in). Therefore, engine oil consumption complaints received prior to 6,000 miles cannot be considered.

Once a new or remanufactured engine has accumulated 6,000 miles, oil consumption can be considered if there is a drastic change in the engine oil consumption rate (e.g., the engine oil consumption rate triples) under similar driving conditions.

Engines equipped with a turbocharger(s) will consume more engine oil than normally aspirated engines (non-turbocharged). The additional oil that is consumed in a turbocharged engine is mainly due to the turbocharger lubrication requirements. Some of the engine oil normally migrates past the turbocharger turbine bearing seals and will enter the intake tract of the engine.

All turbocharged engines also require a complex crankcase ventilation system. The crankcase ventilation system needs to maintain a small vacuum on the crankcase and not allow the crankcase to be pressurized. Pressurizing the engine crankcase can lead to external engine oil leaks and increased engine oil consumption via the piston rings and valve seals. When the load and the boost level of a turbocharged engine is varied, the path of the crankcase pressure is changed. During the crankcase ventilation path transition, a small amount of engine oil will pass through the crankcase ventilation system and is additionally consumed. The additional engine oil consumption of a turbocharged engine, as compared to a normally aspirated engine, is normal and not a defect.

Oil Consumption specification:
- All BMW engines (excluding Motorsport) can consume up to 1 quart of engine oil per 750 miles at any time.
- Due to the increased engine power, all Motorsport engines can consume up to 2.5 quarts of engine oil per 1,000 miles at any time.
Turbocharged Engines:
Engines that are fitted with a turbocharger(s) will consume more engine oil than naturally aspirated engines (non-turbocharged engines). In this case, a turbocharged engine could require topping of engine oil more frequently. For vehicles with N63 and N63T engines, refer to SIB-11-03-13 for additional details.

10

48.     BMW included every conceivable driving situation within this Service Bulletin as a factor for engine oil consumption so as to minimize their own responsibility and/or deflect blame onto consumers for the oil consumption defect. As can be seen from the TSBs, Defendants continued to misrepresent to their customers that the rate of oil consumption in the N63 engines was normal and to be expected in engines that are fitted with turbochargers.

49.     BMW made these representations notwithstanding that the stated recommended oil service interval at the time of sale of the subject vehicles was the earlier of 15,000 miles or two years. Of course, at the rate of engine oil consumption referred to in BMW's service bulletin, the N63 vehicles would consume nearly 20 quarts of engine oil between the recommended 15,000-mile oil service intervals. Clearly, there is nothing normal or expected about this rate of oil consumption.

50.     Many N63 purchasers and automobile consumer advocates disagree that this level of engine oil consumption is normal and instead believe that it is excessive and well beyond normal.

51.     Consumer Reports offered its opinion of excessive oil consumption in the subtitle of its article: *Excessive oil consumption isn't normal: Automakers say adding oil between scheduled changes is acceptable. It's not.*

(http://www.consumerreports.org/cro/magazine/2015/06/excessive-oil-consumption/index.htm.)

52.     Following hundreds of customer complaints about the oil consumption defect and other problems with N63 vehicles, BMW launched the "N63 Customer Care Package" (bulletin B001314) on December 29, 2014 (herein, "Customer Care Package"). The Customer Care Package consisted of several different measures, which merely mask, but do not correct,

the serious design and/or manufacturing defects of the N63 engine including the oil consumption defect.

53.    The Customer Care Package instructed service representatives to check each covered vehicle's timing chain, fuel injectors, mass air flow sensors, crankcase vent lines, battery, engine vacuum pump, and low pressure fuel sensor, and replace if necessary. BMW instructed its service representatives to inspect and replace these components for free, even if no longer covered by the manufacturer's standard four-year/50,000 mile warranty.

54.    Also, BMW had long emphasized the fact that its vehicles can go long periods without service and sold many N63 vehicles with the promise of a two-year or 15,000 mile service interval. The Customer Care Package significantly reduced the mileage of its recommended engine oil change intervals for the subject vehicles. As a result, BMW reduced the oil change intervals from the earlier of 15,000/two years to the earlier of 10,000 miles or one year.

55.    BMW simultaneously launched the "N63 Customer Loyalty Offer" which offered purchasers discounts on new BMW vehicles to replace their defective N63 vehicles.

56.    BMW also launched a related "N63 Customer Appreciation Program," which authorized dealerships to provide purchasers with up to $50 of BMW merchandise or accessories.

57.    Engine oil is important because it functions as an essential lubricant for the moving parts in internal combustion engines. The oil creates a film separating surfaces of adjacent moving parts to minimize direct contact, thereby decreasing heat caused by friction and reducing wear. Engine oil also has important cleaning and sealing functions, and serves as an important medium for dissipating heat throughout the engine. As a result, the subject

12

vehicles need the proper amount of engine oil in order for the engine and its related parts to function safely.

58.     As suggested by the N63 Customer Care Package, upon information and belief, the oil consumption defect impacts several components of N63 vehicles, either via combustion of excessive amounts of engine oil directly or by causing these components a lack of appropriate lubrication, which results in these components to prematurely fail and need frequent replacement.

59.     The oil consumption defect is a safety concern because it prevents the engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted.  Therefore, this oil consumption defect is unreasonably dangerous because it can cause engine failure while the subject vehicles are in operation at any time and under any driving conditions or speeds, thereby exposing the Plaintiff, his passengers, and others who share the road with them to serious risk of accidents and injury.

60.     Plaintiff is informed and believes, and based thereon alleges that BMW acquired its knowledge of the oil consumption defect in 2008, if not before, through sources not available to Plaintiff, including but not limited to pre-release testing data, durability testing, early consumer complaints about the oil consumption defect to Defendants and their dealers, testing conducted in response to those complaints, aggregate data from BMW dealers, including dealer repair orders and high warranty reimbursement rates, as well as, from other internal sources.

61.     Defendants had a duty to disclose the oil consumption defect and the associated out-of-pocket repair costs to Plaintiff because the defect poses an unreasonable

safety hazard, and because Defendants had exclusive knowledge or access to material facts about the subject vehicles that were not known or reasonably discoverable by the Plaintiff. Defendants, however, failed to disclose the Oil Consumption Defect to consumers prior to or at the time of purchase or lease.

62.     An engine that is starved of oil can seize up and cause the vehicle to shut down when driven, thus creating for Plaintiff an unreasonably dangerous circumstance that may result in a crash.

63.     The oil consumption defect can be and has been enormously consequential to Plaintiff, burdening him with out-of-pocket expenses that would not be necessary but for such defect and depriving him of his original bargain.  First, excessive engine oil consumption requires additional service visits and increased maintenance costs due to the recently decreased oil change intervals, which the Plaintiff specifically sought to avoid by purchasing a high-end BMW vehicle. Second, the oil consumption defect means that Plaintiff must be concerned with obtaining BMW-approved engine oil when needed.  If Plaintiff continues to drive without adding oil, his vehicle might catastrophically fail and strand him or potentially cause a life-threatening accident.  This discourages Plaintiff from traveling long distances in his N63 vehicle or forces him to carry an extra supply of oil.  Third, Plaintiff will suffer significant loss when he sells the subject vehicle because the reputation of these vehicles has been impaired by now-public research establishing that these vehicles suffer from the oil consumption defect.

64.     Plaintiff provided Defendants or one or more of its authorized dealers with an opportunity to repair the problems with the subject vehicle. The Defendants have neglected,

failed, refused or otherwise been unable to repair the substantial impairments to the subject vehicle within a reasonable amount of time or a reasonable number of attempts.

65.    The oil consumption defect experienced by the Plaintiff substantially impairs the use, value and safety of the subject vehicle to the Plaintiff.

66.    The Plaintiff could not reasonably have discovered said nonconformities with the subject vehicle prior to Plaintiff's acceptance of the vehicle.

67.    The Plaintiff would not have purchased the subject vehicle or would have paid significantly less for the subject vehicles had he known, prior to the time of purchase, that he would be required to regularly purchase and add large volumes of engine oil to the subject vehicle in order to prevent the subject vehicle's engine from failing.

## TOLLING OF STATUTE OF LIMITATIONS

### I.    Fraudulent Concealment Tolling

68.    Plaintiff did not and could not have known that there was an oil consumption defect with the subject vehicle's engine at the time that he purchased the subject vehicle or any time thereafter.

69.    The breach of warranties four-year statute of limitations, which might otherwise apply to bar some of the Plaintiff's claims, should be tolled because of Defendants' knowing and active concealment of the fact that the subject vehicle's engine contains a defect.

70.    Defendants had a duty to disclose the oil consumption defect in the Plaintiff's vehicle and had a duty to warn the Plaintiff, who will foreseeably drive his vehicle, of those dangers, as an engine that is starved of oil can seize up and cause the vehicle to shut down when driven, thus creating for Plaintiff an unreasonably dangerous circumstance that may result in a crash.

15

71.     While Defendants issued TSBs making clear they were aware that there was a defect with the subject vehicle's engine, Defendants failed to disclose the existence of the defect to Plaintiff at the time of the subject vehicle sale and at the time Plaintiff presented his vehicle to Defendants' authorized dealer for repairs.

72.     Moreover, Defendants' authorized dealership informed the Plaintiff that the subject vehicle's excessive consumption of engine oil was normal, rather than the result of a defect.

73.     Defendants kept Plaintiff ignorant of vital information essential to the pursuit of his claim.

74.     Defendants knowingly, affirmatively, and actively concealed the subject vehicle's defect from the Plaintiff.

75.     Defendants were aware of the defect with the subject vehicle.

76.     Based upon the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**II.    Discovery Rule Tolling**

77.     Plaintiff could not have discovered through the exercise of reasonable diligence that his vehicle contained the oil consumption defect within the time period of any applicable statutes of limitation.

78.     Plaintiff did not know the engine in his vehicle was defective when he purchased his vehicle.  Plaintiff did not and could not have known that the SIB-11-01-13 and the N63 Customer Care Package campaigns did not cure the oil consumption defect and left the subject vehicles engine vulnerable to catastrophic failure in the course of its normal operation.

16

79.     Although Defendants launched the SIB-11-01-13 and the N63 Customer Care Package campaigns for the subject vehicles, the campaigns were limited in scope, and consumers were not informed that that the campaigns would not cure the oil consumption defect and remove the risk of the subject vehicles' engines vulnerable to catastrophic failure in the course of their normal operation.

**III.    Estoppel**

80.     Defendants were under a continuous duty to disclose to the Plaintiffs the true character, quality, and nature of the subject vehicle.

81.     Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of the subject vehicle from Plaintiff, and Defendants never intended to repair the oil consumption defect in the subject vehicle.

82.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**IV.    Class Action Tolling**

83.     The statutes of limitation applicable to Plaintiff's claims – including, without limitation, his breach of express warranty and implied warranty claims – have additionally been tolled by class action tolling in light of the *Bang v. BMW of North America, LLC* (Case No. 2:15-CV-6945) Complaint, filed September 18, 2015, and the Second Amended Complaint, filed in that case on March 21, 2016 (attached hereto as Exhibit A). *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350, 103 S. Ct. 2392, 2396 (1983) ("The filing of a class action tolls the statute of limitations 'as to all asserted members of the class'").

84.     Plaintiff was a member of the certified *Bang* class.

85.     Plaintiff opted out of the *Bang* class action settlement on August 10, 2018.

**FIRST CAUSE OF ACTION**
**Breach of Warranty Pursuant to the Magnuson-Moss**
**Warranty Act, 15 U.S.C. §2301, *et seq.***

86.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

87.     The Plaintiff is a "consumer" as defined in 15 U.S.C. § 2301(3).

88.     Defendants are each a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4) and (5).

89.     The subject vehicle is a "consumer product" as defined in 15 U.S.C. § 2301(6). 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

90.     15 U.S.C. § 2304(a)(1) requires Defendants, as warrantors, to remedy any defect, malfunction or nonconformance of the subject vehicles within a reasonable time and without charge to the Plaintiff.

91.     Despite repeated demands, Defendants have failed to remedy the subject vehicle's oil consumption defect within a reasonable time, and/or a reasonable number of attempts, thereby breaching the written and implied warranties applicable to the subject vehicles.

92.     As a result of Defendants' breaches of written and implied warranties, and Defendants' failure to remedy the same within a reasonable time and without charge to Plaintiff, Plaintiff has suffered damages.

**SECOND CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability Pursuant to the Magnuson-Moss**
**Federal Act, 15 U.S.C. §2301, *et seq.* and Ind. Code § 26-1-2-314**

93.     Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

94.      Defendants are merchants with respect to motor vehicles.

95.      The subject vehicle was subject to implied warranties of merchantability, as defined in 15 U.S.C. § 2308 and W.S.A. §402.314, running from the Defendants to the Plaintiff.

96.      An implied warranty that the subject vehicle was merchantable arose by operation of law as part of the purchase of the subject vehicle.

97.      Defendants breached the implied warranty of merchantability in that the subject vehicle was not in merchantable condition when the Plaintiff purchased it, or at any time thereafter, and the subject vehicle is unfit for the ordinary purposes for which such vehicle is used.

98.      Plaintiff notified Defendants of the defects in the subject vehicle within a reasonable time after Plaintiff discovered them.

99.      As a result of Defendants' breaches of the implied warranty of merchantability, Plaintiff has suffered damages, including but not limited to incidental and consequential damages.

**THIRD CAUSE OF ACTION**
**Breach of Express Warranties**
**Ind. Code § 26-1-2-313**

100.      Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

101.      In connection with the sale of the subject vehicle to the Plaintiff, Defendants provided the Plaintiff with a New Vehicle Limited Warranty under which they agreed to repair original components found to be defective in material or workmanship under normal use and maintenance, including the engine and its components.

102.    Plaintiff relied on Defendants' warranties when he agreed to purchase the subject vehicle and Defendant's warranties were part of the basis of the bargain.

103.    Plaintiff submitted his vehicle for warranty repairs as referenced herein. Defendants failed to comply with the terms of the express written warranty provided to Plaintiff, by failing and/or refusing to repair the oil consumption defect under the vehicle's warranty as described herein.

104.    Plaintiff has given Defendants reasonable opportunities to cure said defect, but Defendants have been unable and/or have refused to do so within a reasonable time.

105.    As a result of said nonconformities, Plaintiff cannot reasonably rely on the subject vehicle for the ordinary purpose of safe, comfortable, and efficient transportation.

106.    The Plaintiff could not reasonably have discovered said nonconformities with the subject vehicle prior to Plaintiff's acceptance of the subject vehicle.

107.    The Plaintiff would not have purchased the subject vehicle, or would have paid less for the subject vehicle, had he known, prior to the time of purchase, that the subject vehicle contained the oil consumption defect.

108.    As a direct and proximate result of the willful failure of Defendants to comply with their obligations under the express warranties, Plaintiff has suffered actual and consequential damages.  Such damages include, but are not limited to, the loss of the use and enjoyment of his vehicle, and a diminution in the value of the subject vehicle containing the defects identified herein.

## FOURTH CAUSE OF ACTION
### Violation of the Indiana Deceptive Consumer Sales Act
### Ind. Code § 24-5-0.5-1, *et seq.*

109.    The Plaintiff incorporates by reference all allegations contained in this Complaint as though fully stated herein.

110.    Each Defendant is a "supplier" under Ind. Code. § 24-5-0.5-2(a)(3) by advertising, offering for sale, selling, leasing, and/or distributing the subject vehicle in the United States, including Indiana.

111.    Plaintiff is a consumer under Ind. Code § 24-5-0.5-1, *et seq.* because he sought or acquired the subject vehicle by purchase by and through a "consumer transaction."

112.    Under the Indiana Deceptive Consumer Sales Act ("IDCSA"), suppliers, such as Defendants, are prohibited from engaging in unfair, abusive, or deceptive acts, omissions, or practices in connection with a consumer transaction. Such acts, omissions, or practices by suppliers such as Defendants are in violation of the IDCSA whether they occur before, during, or after the transaction at issue, and include both implicit and explicit misrepresentations.

113.    The allegations set forth herein constitute deceptive sales practices in violation of Ind Code § 24-5-0.5-1, *et seq.*

114.    Specifically, and as alleged above, Defendants knew or should have known that the twin-turbo charged engine in Plaintiff's vehicle had one or more defects that causes the subject vehicle to be unable to properly utilize the engine oil and, in fact, to improperly burn off and/or consume abnormally high amounts of oil.  The oil consumption defect decreases the lubrication available to engine parts, which results in premature failure.  As a consequence, the oil consumption defect requires unreasonably frequent oil changes and/or the addition of oil between scheduled oil changes.

115.    The oil consumption defect also is a significant safety concern in that it prevents the subject vehicle's engine from maintaining the proper level of engine oil, and causes voluminous oil consumption that cannot be reasonably anticipated or predicted. Therefore, the oil consumption defect is unreasonably dangerous because it can cause engine failure while the subject vehicle is in operation at any time and under any driving conditions or speeds, thereby exposing the subject vehicle's driver, passengers, and others who share the road with them, to serious risk of accidents and injury.

116.    Defendants acquired knowledge of the oil consumption defect prior to Plaintiff acquiring the subject vehicle, through sources not available to consumers such as Plaintiff, including but not limited to pre-production and post-production testing data, early consumer complaints about the engine defect made directly to Defendants and their network of dealers, aggregate warranty data compiled from Defendants' network of dealers, testing conducted by Defendants in response to these complaints, as well as warranty repair and parts replacement data received by Defendants from Defendants' network of dealers, amongst other sources of internal information.  Defendants also became aware of the defect as a result of public online complaints about defect discussed above.

117.    While Defendants knew about the oil consumption defect, and its safety risks since mid-2008, if not before, Defendants nevertheless concealed and failed to disclose the defective nature of the subject vehicle and its engine to Plaintiff at the time of purchase and during each subsequent instance where Plaintiff presented his vehicle to Defendants' authorized dealerships complaining about excessive engine oil consumption.

118.    By failing to disclose and concealing the defective nature of the N63 engine from Plaintiff, Defendants violated the Indiana Deceptive Consumer Sales Act as it

represented that the subject vehicle and its engine had characteristics and benefits that it does not have, and represented that the subject vehicle and its engine was of a particular standard, quality, or grade when it was of another.

119.    The facts concealed or not disclosed by Defendants to Plaintiff are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase the subject vehicle.

120.    Plaintiff relied to his detriment on those false, misleading, or deceptive representations made by Defendants.

121.    Such representations were a producing cause of the economic loss sustained by Plaintiff.

122.    Pursuant to Ind. Code Ann. § 24-5-0.5-5, by a letter dated June 20, 2018, Plaintiff, through his counsel, has given a written notice to Defendants informing them that Plaintiff's vehicle consumed an excessive amount of engine oil, that Defendants' failed and/or refused to repair the oil consumption defect in the Plaintiff's vehicle and that same defect continued to persist.

123.    Plaintiff should be awarded three times the amount of his economic damages because Defendants intentionally concealed and failed to disclose the defective nature of the subject vehicle.

## **DEMAND FOR RELIEF**

WHEREFORE, the Plaintiff demands judgment against Defendants as follows:

a.    An order approving revocation of acceptance of the subject vehicle;

b.   Money damages, in the form of a refund of the full contract prices, including, trade-in allowance, taxes, fees, insurance premiums, interest, and costs, and a refund of all payments made by Plaintiff on the subject contract;

c.   Equitable relief including, but not limited to, replacement of the subject vehicle with a new vehicle, or repair of the defective subject vehicle with an extension of the express and implied warranties, and service contract which are or were applicable to the subject vehicle, in the event that Plaintiff is not found to be entitled to revocation;

d.   Incidental and consequential damages;

e.   Punitive damages;

f.   Reasonable attorney's fees;

g.   Such other and further relief as this Court deems just and proper.

**TRIAL BY JURY DEMANDED ON ALL COUNTS**

Dated: June 19, 2019

Respectfully submitted,

By:   /s/ Amy L. Cueller
Amy L. Cueller, Esq.
LEMBERG LAW, L.L.C.
43 Danbury Road
Wilton, CT 06897
Telephone: (203) 653-2250
Facsimile:  (203) 653-3424
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

THIS IS TO CERTIFY that on June 19, 2019, a copy of the foregoing was served electronically by the U.S. District Court for the Southern District of Indiana Electronic Document Filing System (ECF) and the document is available on that system.


      /s/ Amy L. Cueller
      Amy L. Cueller