UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

PHILLIP CARROLL,                          )
                                          )
                       Plaintiff,         )
                                          )
        vs.                               )        No. 1:19-cv-000224-JMS-TAB
                                          )
BMW OF NORTH AMERICA, LLC and             )
BAVARIAN MOTOR WORKS,                     )
                                          )
                       Defendants.        )

## ORDER

Plaintiff Phillip Carroll purchased a new BMW vehicle ("the Vehicle") in 2010.  On

January 22, 2019, he filed suit against Defendants BMW of North America, LLC ("BMW") and

Bavarian Motor Works, seeking damages related to the Vehicle's alleged excessive consumption

of engine oil and Defendants' alleged failure to honor the terms of their warranty, in violation of

the Magnuson-Moss Warranty Act ("MMWA") and Indiana law.  BMW moved to dismiss Mr.

Carroll's claims, arguing that this action is barred by the statute of limitations, and the Court

denied the motion, concluding that the statute of limitations issue should be adjudicated at

summary judgment with the benefit of a more developed evidentiary record.  [Filing No. 48.]

The parties have engaged in discovery on the statute of limitations issue, BMW has filed a

Motion for Summary Judgment on all claims, [Filing No. 101], and Mr. Carroll has filed a Cross-

Motion for Partial Summary Judgment seeking judgment in his favor on BMW's statute of

limitations defense, [Filing No. 112].  In addition, BMW has filed a Motion to Exclude the

Opinions and Testimony of Plaintiff's Expert, Darren Manzari, [Filing No. 125], and a Motion to

Strike Plaintiff's Notice of Supplemental Authority, or in the Alternative, For Leave to File a

Sur-Reply, [Filing No. 148].  All four of these motions are ripe for the Court's decision.

1

**I.**

**SUMMARY JUDGMENT STANDARD**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325

2

F.3d 892, 901 (7th Cir. 2003).   The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.   *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).   The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.   *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).   It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.   *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).   The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them."   *Johnson*, 325 F.3d at 898.   Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.   *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact."   *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003).   Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail" on summary judgment.   *Id.* at 648.

## II.
### STATEMENT OF FACTS[1]

The following factual background is set forth pursuant to the standards outlined above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented and considered with respect to each motion in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.  N63 Engines

The N63 engine is a high-performance V8 engine equipped with turbochargers.  [Filing No. 102-3 at 79; Filing No. 102-3 at 84; Filing No. 108-1 at 7.]  The N63 engine was put into production by BMW in approximately March of 2008.  [Filing No. 108-1 at 7.]  Mr. Carroll's Vehicle is equipped with an N63 engine.  [Filing No. 89 at 7.]

### B.  The Vehicle and its Service History

Mr. Carroll purchased the Vehicle on April 15, 2010 from Bill DeFouw BMW ("DeFouw"), an authorized BMW dealer.  [Filing No. 29 at 3; Filing No. 102-1 at 9-10.]  The Vehicle was covered by a limited warranty ("the Warranty") lasting for 48 months (4 years) or

---

[1] At the outset, the Court notes that BMW failed to comply with this Court's Practices and Procedures for citing to record evidence in its initial brief.  The Practices and Procedures require that exhibits be filed before briefs and direct the parties to "cite to the docket number, the attachment number (if any), and the applicable .pdf page as it appears on the docket information located at the top of the filed document."  [Filing No. 5 at 4.]  BMW's citations do not follow this format, and instead identify exhibits by number or document titles, such as "Ex. 1 (Ex. A to the Carroll Deposition), pp. 18:2-19:4, 19:14-20."  Although it is unclear, the Court interprets this to reference specific lines of Mr. Carroll's deposition as well as the first exhibit to his deposition. The proper citation for this material would be "Filing No. 102-1 at 20-21; Filing No. 102-1 at 106."  Failure to follow the proper citation conventions has made the Court's review of the evidence unnecessarily difficult and cumbersome.

50,000 miles, whichever occurred first.  [Filing No. 102-1 at 102.]  In relevant part, the Warranty

provided:

> [BMW] warrants 2010 U.S. specification vehicles . . . against defects in materials
> or workmanship to the first retail purchaser, and each subsequent purchaser.
>
> ***
>
> To obtain service under this warranty, the vehicle must be brought, upon
> discovery of a defect in material or workmanship, to the workshop of any
> authorized BMW center . . . .  The BMW center will, without charge for parts or
> labor, either repair or replace the defective part(s) using new or authorized
> remanufactured parts.  The decision to repair or replace said part(s) is solely the
> prerogative of [BMW].

[Filing No. 102-1 at 102.]  Oil changes and other maintenance could be provided at no cost

during the Warranty period.  [Filing No. 102-1 at 13.]

Mr. Carroll took the Vehicle to DeFouw for an oil change for the first time on June 8,

2011.  [Filing No. 102-1 at 19-20; Filing No. 102-1 at 105.]  At that time, the Vehicle had 13,039

miles, and there were no problems with the Vehicle aside from the fact that a service light ("the

Service Light") was illuminated indicating it was due for an oil change.  [Filing No. 102-1 at 20-

21; Filing No. 102-1 at 105.]

Sometime after the first oil change, in the winter or spring of 2012, Mr. Carroll "had

gotten the notice on [his] car to add a quart of oil" ("the Add Oil Light").  [Filing No. 102-1 at

23; *see also* Filing No. 102-1 at 25-26.]  He was concerned and called DeFouw to ask about the

notice.  [Filing No. 102-1 at 23.]  Mr. Carroll spoke to the Service Manager, but does not

remember his name.  [Filing No. 102-1 at 27.]  According to Mr. Carroll, the Service Manager

stated that "this was a high-performance engine and that was normal for this car."  [Filing No.

102-1 at 23; *see also* Filing No. 102-1 at 29 (Mr. Carroll stating, "It wasn't unusual, I think . . .

[were] his words, that [the Vehicle] would burn a quart of oil.").]  The Service Manager did not

suggest that Mr. Carroll bring the Vehicle in for inspection or potential repairs.  [Filing No. 102-

1 at 58-59.] Mr. Carroll did not take the Vehicle to be serviced or request that the oil be changed, but instead purchased a quart of oil for four or five dollars and added it himself. [Filing No. 102-1 at 27-28; Filing No. 102-1 at 30.] After he added the oil, the Add Oil Light went off. [Filing No. 102-1 at 28.]

According to Mr. Carroll, after adding oil the first time, the Add Oil Light "would go on about once a year." [Filing No. 102-1 at 31.] When the Add Oil Light came on, Mr. Carroll would add a quart of oil and the light would go off. [Filing No. 102-1 at 31.] The Vehicle otherwise "would drive just fine." [Filing No. 102-1 at 32.] Mr. Carroll was aware that he could take the Vehicle to a dealership during the Warranty period and the dealership would have topped the oil off for him, but he felt it was inconvenient to do so and instead added the oil himself. [Filing No. 102-1 at 32-33.] Mr. Carroll stated that he "wasn't concerned" about having to add oil to the Vehicle, given that the Service Manager had told him that it was normal to have to do so. [Filing No. 102-1 at 33.] He never mentioned during any of his maintenance or repair appointments that the Add Oil Light came on or that he was adding oil to the Vehicle between oil changes. [Filing No. 102-1 at 59-62.]

Mr. Carroll took the Vehicle to DeFouw for a second oil change on July 25, 2012, when it had 26,185 miles on it. [Filing No. 102-1 at 21; Filing No. 102-1 at 108.] The Service Light was illuminated, indicating the need for an oil change, but the Add Oil Light had not come back on since he added oil the first time. [Filing No. 102-1 at 22-23; Filing No. 102-1 at 30.] DeFouw also repaired the Vehicle's front area deflector and rear climate control knob, but there were no other problems with the Vehicle at that time. [Filing No. 102-1 at 23.]

Mr. Carroll took the Vehicle to DeFouw for a third oil change and other unrelated maintenance on December 17, 2013, when the Vehicle had 42,304 miles.  [Filing No. 102-1 at 33-34; Filing No. 102-1 at 114.][2]

On September 18, 2014, Mr. Carroll took the Vehicle to Dreyer & Reinbold of Greenwood ("Dreyer & Reinbold"), an authorized BMW dealer, for the fourth oil change. [Filing No. 102-1 at 36-38; Filing No. 102-1 at 118.]  At that time, the Vehicle had 51,896 miles, and therefore the Warranty had ended.  [Filing No. 102-1 at 37; Filing No. 102-1 at 118.]  Mr. Carroll did not mention any problems with oil consumption during this visit, although he was still adding oil about once a year.  [Filing No. 102-1 at 37-38.]

On September 24, 2014, when the Vehicle had 52,081 miles, Mr. Carroll took the Vehicle back to Dreyer & Reinbold with complaints of an oil leak.  [Filing No. 102-1 at 41-42; Filing No. 102-1 at 121.]   Dreyer & Reinbold replaced the upper and lower crank case ventilation lines to fix the oil leak.  [Filing No. 102-1 at 42; Filing No. 102-1 at 121.]  According to Mr. Carroll, this repair did not have any impact on the Vehicle's oil consumption.  [Filing No. 102-1 at 61.]

Mr. Carroll took the Vehicle to Dreyer & Reinbold for an oil change on October 26, 2015, when the Vehicle had 67,549 miles.  [Filing No. 102-1 at 44-45; Filing No. 102-1 at 131.] Mr. Carroll took the Vehicle to Stewart Tire & Auto Service in Indianapolis for oil changes on

---

[2] Mr. Carroll took the Vehicle to DeFouw for maintenance unrelated to oil consumption on March 29, 2013 (tires and brake pads), [Filing No. 102-1 at 31; Filing No. 102-1 at 112], and to Dreyer & Reinbold for unrelated maintenance on April 8, 2014 (battery), [Filing No. 102-1 at 35-36; Filing No. 102-1 at 116], December 16, 2014 (battery), [Filing No. 102-1 at 42-43; Filing No. 102-1 at 124-25], and June 30, 2016 (brake fluid, tires, power steering, air conditioning, replacement key fob, valet function), [Filing No. 102-1 at 45-47; Filing No. 102-1 at 140-43]. Mr. Carroll did not complain about oil consumption at any of these visits.  [Filing No. 102-1 at 35-36; Filing No. 102-1 at 43.]

June 2, 2016, when the Vehicle had 73,370 miles on it, and on July 12, 2017, when the Vehicle had 88,510 miles on it.  [Filing No. 113-16 at 2; Filing No. 113-17 at 40-41.]

Sometime in 2017, the Vehicle began "noticeably smoking," although Mr. Carroll does not remember if he reported this issue to any dealership.  [Filing No. 102-1 at 50.]  On September 26, 2017, when the Vehicle had 91,522 miles on it, Mr. Carroll took it to Dreyer & Reinbold for an oil change.  [Filing No. 102-1 at 48-49; Filing No. 102-1 at 148-50.]  He does not recall if he discussed oil consumption during this visit.  [Filing No. 102-1 at 49-50.]

On July 12, 2018, when the Vehicle had 100,324 miles on it, Mr. Carroll took the Vehicle to Dreyer & Reinbold with complaints that the Vehicle was burning oil quickly, consuming 1 quart of oil every 1,000 miles, and leaking oil.  [Filing No. 102-1 at 50-51; Filing No. 102-1 at 157-65.] According to Mr. Carroll, the Vehicle was not running well, and the Add Oil Light was coming on every few weeks.  [Filing No. 102-1 at 52.]  This was the first time that Mr. Carroll told any BMW dealer that he believed the Vehicle was consuming oil excessively.  [Filing No. 102-1 at 51.]  Dreyer & Reinbold began an oil consumption test by draining the oil, recording that the Vehicle had 6 quarts of oil in it, filling the oil to the correct level, and instructing Mr. Carroll to bring the Vehicle back to the dealership after 1,000 miles or when the Add Oil Light came on, whichever occurred first.  [Filing No. 102-1 at 157.]  Dreyer & Reinbold technicians further recommended replacing the valve cover gaskets and the crank case ventilation lines.  [Filing No. 102-1 at 164-65.]  Mr. Carroll testified that the Dreyer & Reinbold technicians were not sure if the recommended repairs would fix the oil consumption problem.  [Filing No. 102-1 at 53-54.]  There is no service record showing the Mr. Carroll returned to complete the oil consumption test or stating the results of the test.

Mr. Carroll testified that on one unspecified occasion when he was at Dreyer & Reinbold, a technician told him that the Vehicle held nine and a half quarts of oil, and when the Add Oil Light came on, there were six quarts left.  [Filing No. 102-1 at 52.]  Based on that information, Mr. Carroll began adding two and a half or three quarts of oil—instead of one—each time the Add Oil Light came on.  [Filing No. 102-1 at 52.]

Mr. Carroll stopped driving the Vehicle in December 2018 or January 2019, and he now stores it in his garage.  [Filing No. 102-1 at 16; Filing No. 102-1 at 51-52; Filing No. 102-1 at 54.]  He testified that the Vehicle still runs, but "[v]ery badly," and has over 100,000 miles on it.  [Filing No. 102-1 at 16-17.]  According to Mr. Carroll, an employee of Dreyer & Reinbold told him that the Vehicle could not be repaired without replacing the engine, which the employee estimated would cost approximately $25,000.  [Filing No. 102-1 at 17-19.]

### C.  BMW's Internal Reports and Documents Concerning Oil Consumption in the N63 Engine

BMW has a technical hotline that receives information from dealers, and on a weekly basis hotline specialists report the information they receive to Michael Murray, BMW's Senior Product Engineer.  [Filing No. 108-1 at 5; Filing No. 108-1 at 17.]  It was through these reports that BMW received its first customer complaint related to oil consumption in the N63 engine "[s]ometime in 2010."  [Filing No. 108-1 at 12.]

According to Mr. Murray, the specification for oil consumption of vehicles equipped with N63 engines is one quart per 750 miles and has been since "when these cars first came out."  [Filing No. 108-1 at 40-41.]  "That specification is standard for all BMW vehicles, and it was created in 1984."  [Filing No. 108-1 at 41; *see also* Filing No. 108-1 at 44 ("The specification for oil consumption is 1 quart per 750 miles before repairs can be made.").  Mr. Murray stated that it

generally was the policy of BMW to look for causes of oil consumption only if the car failed to meet the specification.  [Filing No. 108-1 at 86-87.]

On December 20, 2010, Mr. Murray created the first report from BMW to BMW's parent company in Germany ("BMW Germany") concerning the N63 oil consumption issue.  [Filing No. 108-1 at 17-18.]   The report was based on two vehicles with N63 engines that both "appeared to have a problem with . . . the crankcase ventilation hose."  [Filing No. 108-1 at 17.] The subject line of the report reads, "N63 Rough Running, Burnt Oil Smell, Crankcase Ventilation Hose Leak Engine Oil or Vapor."  [Filing No. 118-3 at 1.]   Under the heading "Summary of workshop fault descriptions and presumed causes," the report reads, "Crankcase ventilation hoses between the fresh air intake and the cylinder head cover are leaking resulting in various complaints."  [Filing No. 118-3 at 2.]   The report recommended that the affected components be replaced.  [Filing No. 118-3 at 2.]

On March 11, 2011, Mr. Murray updated the December 20, 2010 report based on information he had received through the hotline of complaints related to the crankcase ventilation system issue.  [Filing No. 108-1 at 30-31; Filing No. 118-3 at 4-6.]   Also on March 11, 2011, Mr. Murray prepared a second report to BMW Germany concerning a customer report of smoke and excessive oil consumption caused by "Possible failed Turbo(s)."  [Filing No. 108-1 at 31; Filing No. 118-3 at 7-9.]

On September 23, 2011, BMW Germany issued a measure[3] to its dealers with the subject "N63 Oil consumption too high."  [Filing No. 118-3 at 10-12.]   The measure noted that some

---

[3] According to Paul Grimaldi, a Technical Service Advisor for BMW, "measures" are created by BMW Germany to address issues that have come up a handful of times, but not enough times to require a formal service information bulletin.  [Filing No. 102-3 at 68 ("A measure is something that we suspect there may be a handful of these and it's not really documented that there's

customers had complained of high oil consumption, blue smoke coming from the exhaust system, and oil leaking from the intake manifold, and directed dealers to conduct an oil consumption measurement in the event of such complaints.  [Filing No. 118-3 at 10.]  If oil consumption was too high or oil was "already emerging from the intake manifold," dealers were directed to replace the crankcase ventilation hoses and the air filter elements.  [Filing No. 108-1 at 40; Filing No. 118-3 at 10.]  If the engine was still consuming too much oil after those repairs, dealers were directed to contact Technical Support.  [Filing No. 118-3 at 10.]  An "internal note" on the measure states that if repairing the crankcase ventilation system does not provide a solution, and "if no other cause for the high rate of oil consumption can be found," then "fitting an exchange engine" may be required.  [Filing No. 118-3 at 11.]

On July 25, 2012, Mr. Murray created another report to BMW Germany after receiving information that a customer had complained that "the [N63] engine requires topping of oil to[o] frequently," leading to "[c]ustomer annoyance."  [Filing No. 118-3 at 13-14.]  In that case, the dealer had "[v]erified that all affected components [were] not defective," including "turbos, crankcase (sic) ventilation pipes, no leaks etc."  [Filing No. 118-3 at 14.]  Because no cause could be identified, the issue was "[u]nder investigation" and the report recommended that the dealer "[t]op engine oil to required level."  [Filing No 118-3 at 14.]  Mr. Murray testified that this report was "probably" based on "one or two" sample cases in which customers had complained about oil consumption.  [Filing No. 108-1 at 65-66.]

In July 2012, BMW issued a Service Information Bulletin to its dealers, written by Mr. Murray, with the subject "N63 Engine: Oil Consumption and/or Rough Running Complaints."  [Filing No. 113-12 at 1-3.]  The bulletin stated that a vehicle "may consume engine oil above the

sufficient evidence to say it is an issue that requires the production of a service information bulletin.").]

permissible specification, and may run rough at times," and "[w]hite or blue smoke may also be seen exiting the exhaust system." [Filing No. 113-12 at 1.] The bulletin attributed these issues to faulty crankcase ventilation hoses and provided a procedure that dealers should follow to replace the hoses. [Filing No. 113-12 at 1-2.]

On November 13, 2012, BMW Germany issued a measure with the subject "N63, N63TU: Oil consumption too high from the customer's perspective (must be topped up regularly)." [Filing No. 118-3 at 15-18.] The measure explained that customers have complained that engine oil consumption is too high, but there are no technical defects that could be found or "any further complaints concerning driving characteristics." [Filing No. 118-3 at 15.] Customers reported that between oil services, the "Minimum oil level" warning light came on "several times," directing them to add a quart of oil, although the "customer expects to have to top up the oil no more than once between services." [Filing No. 118-3 at 15.] Under the "Cause" heading, the measure states, in relevant part:

> -The engines do not have any technical failures.
> -Engines with a turbocharger consume more engine oil than customers who drive naturally aspirated engines are used to.
> It is therefore necessary to top up more often. This does not match the customer's expectations.
> -In the customer's opinion, the supply of engine oil is consumed too quickly (volume between maximum and minimum level, limited by geometric conditions).

[Filing No. 118-3 at 15.] The measure directed dealers, in the event of a complaint, to top up the engine with two quarts of oil instead of one when the minimum warning message is shown, and to fill the engine with ten quarts of oil instead of nine during oil service. [Filing No. 118-3 at 16.] Mr. Murray testified that the vehicles at issue in this measure never failed an oil consumption test, never burned more than one quart of oil per 750 miles, and there was "nothing wrong with the vehicle" in each case. [Filing No. 108-1 at 83.] However, BMW decided to

increase the oil capacity because customers perceived a problem with having to top up so often, and BMW wanted to reduce the number of times each customer had to visit the dealership. [Filing No. 108-1 at 82-83.]

On February 26, 2013, Mr. Murray created a report to BMW Germany with the subject, "N63 Oil Consumption - High Mileage - Valve Seals Worn."  [Filing No. 118-3 at 19-20.]  The report noted that engines "consuming engine oil more with higher mileage," and the presumed cause was "[w]orn valve guide seals."  [Filing No. 118-3 at 20.]  The report stated "[i]f all other reasons for oil consumption are exhausted (turbos, leaking ventilation lines, external leaks, etc.) replace the defective valve stem seals."  [Filing No. 118-3 at 20.]  Mr. Murray testified that this report was based on "a handful" of cases.  [Filing No. 108-1 at 97.]

On March 1, 2013, BMW Germany released a measure with the subject "Engine oil consumption, background information."  [Filing No. 118-3 at 21-27.]  It stated: "The customer complains that the engine is consuming too much oil . . . [and] does not understand why the engine oil must be topped up."  [Filing No. 118-3 at 21.]  The cause of the complaint is listed as "The engine requires oil to operate, the amount is affected by the most varied of factors.  The customer is not aware of the technical background info."  [Filing No. 118-3 at 21.]  The measure went on to provide general information about how and why oil is consumed in an engine, and directed dealers as to how to perform oil consumption tests to calculate a particular vehicle's oil consumption rate.  [Filing No. 118-3 at 22-27.]

On March 27, 2013, BMW Germany released a measure concerning oil consumption caused by defective crankcase breathers.  [Filing No. 118-3 at 28-32.]  The measure directed dealers to perform an oil consumption test, replace the crankcase breather if necessary, and

contact Technical Support if the oil consumption issue was not remedied by that repair.  [Filing No. 118-3 at 29-32.]

In April 2013, BMW issued a Service Information Bulletin with the subject "N63 and N63T Engine: Engine Oil Consumption, Engine Oil Top-ups and Refill Capacity."  [Filing No. 113-12 at 4-5.]  The bulletin noted that customers with vehicles with N63 engines "may complain that the engine's oil consumption is 'too high,' resulting in engine oil top-ups and workshop visits to address the issue before the vehicle displays an engine oil service as being 'due.'"  [Filing No. 113-12 at 4.]  According to the report, these complaints are caused by the fact that "[e]ngines that are fitted with a turbocharger, as part of their normal operation, will consume engine oil at a higher rate than a naturally aspirated engine (non-turbocharged engine)."  [Filing No. 113-12 at 4.]  In relevant part, the bulletin provides the following procedure for dealers to follow:

> **Engine oil: Topping up**
>
> When one of the above vehicles displays a message to add 1 quart of engine oil, BMW recommends adding 2 quarts of engine oil instead.
>
> The engine's oil sump design allows the additional quart; the result is a total capacity of 9.5 quarts (9.0 liters) of engine oil.
>
> **Engine oil: Maintenance services and engine repairs**
>
> When performing all future engine oil maintenance services and repairs that require draining and refilling the engine oil, the new recommended refill specification is 9.5 quarts (9.0 liters) of engine oil.

[Filing No. 113-12 at 4-5.]

In May 2013, BMW issued a Service Information Bulletin with the subject "Engine Oil Consumption."  [Filing No. 113-12 at 6-7.]  Regarding oil consumption specifications, the bulletin stated that "[a]ll BMW engines (excluding Motorsport) can consume up to 1 quart of

engine oil per 750 miles at any time." [Filing No. 113-12 at 6.]  The bulletin further provided that "[w]hen an oil consumption complaint is received, it may be possible to correct it without performing extensive engine repairs," and directed dealers to "[c]heck [seven enumerated] frequent causes of excessive oil consumption prior to undertaking any engine consumption analysis or repairs." [Filing No. 113-12 at 6-7.]  These potential causes included improper maintenance, external leakage, crankcase ventilation, and the fact that turbocharged engines will consume more oil than non-turbocharged engines. [Filing No. 113-12 at 7.]

The May 2013 bulletin was then superseded by an August 2013 Service Information Bulletin, which contained the same information but also had attached a brochure titled "BMW Engine Oil Consumption," which was to be distributed to customers. [Filing No. 113-12 at 8-10.] The brochure explained that turbocharged engines will burn more oil than non-turbocharged engines and instructed drivers to top up with two quarts of oil if a light came on indicating that the engine oil was below optimal levels. [Filing No. 113-12 at 10.]

Mr. Murray testified that the August 2013 bulletin was intended to update the original 1984 bulletin regarding oil consumption in order to more comprehensively cover procedures for testing and diagnosing oil consumption issues in turbocharged engines. [Filing No. 108-1 at 114-16.]  According to Mr. Murray, neither the August 2013 bulletin nor the attached brochure included information about worn valve stem seals as a potential cause of oil consumption, because at the time the bulletin and brochure were written and updated there was not enough evidence of a widespread valve stem seal problem to warrant including it as a potential cause. [Filing No. 108-1 at 116-18.]  Mr. Murray testified that "[w]hen the [August 2013 bulletin] was created and to date, we only have 57" vehicles with valve stem seal failure out of the 84,000 cars that were produced. [Filing No. 108-1 at 119.]

In May 2015, BMW issued a Service Information Bulletin with the subject "N63 Engine: Valve Seal Replacement."  [Filing No. 113-12 at 14-17.]  That bulletin was updated in June and July of 2015.  [Filing No. 113-12 at 14-25.]  Each version of the bulletin referred dealers to the previous bulletins regarding oil consumption and specifically oil consumption in N63 engines and stated:

> If the valve seals are leaking, one of the following will help determine if the seals should be replaced:
> - Smoke from the tailpipe when starting or aggressively accelerating and decelerating the engine
> - Excessive engine oil consumption
> - Spark plugs fouled with engine oil
> ***
> If one of these conditions is verified, replace the intake and exhaust valve stem seals . . . .

[Filing No. 113-12 at 14; Filing No. 113-12 at 18; Filing No. 113-12 at 22.]

In August 2016, BMW issued a Service Information Bulletin with the subject "Engine Oil Consumption," which superseded the August 2013 bulletin.  [Filing No. 113-12 at 26-29.] The August 2016 bulletin provided updated information about engine oil consumption, reiterated that turbocharged engines will consume more oil than non-turbocharged engines, and stated that the oil consumption specification for N63 engines is 1 liter[4] per 750 miles.  [Filing No. 113-12 at 26-27.]  The bulletin also provided a list of items to check if a customer complains of excessive oil consumption and outlined the procedures for measuring a particular vehicle's oil consumption.  [Filing No. 113-12 at 27-29.]

---

[4] One liter is equivalent to approximately 1.0567 quarts.

### D.  Conflicting Opinions Regarding the Vehicle's Oil Consumption

#### 1.  *Paul Grimaldi*

Paul Grimaldi is a Technical Service Advisor for BMW and has over 30 years of experience in the field of auto mechanics.  [Filing No. 102-2 at 2.]  According to Mr. Grimaldi, high-performance engines consume more oil than other types of engines, and oil consumption can be further impacted by the way a driver operates the vehicle.  [Filing No. 102-3 at 79-81.] He confirmed that there are some high-performance vehicles that will consume a quart of oil in less than 1,000 miles, and that is considered acceptable.  [Filing No. 102-3 at 83-84.]

Mr. Grimaldi opined that the DeFouw Service Manager's statement to Mr. Carroll that adding one quart of oil per year is "normal" was accurate.  [Filing No. 102-3 at 85-86.]  He testified that adding one quart of oil per year is not evidence of a defect or of excessive oil consumption.  [Filing No. 102-3 at 86-87.]  In his declaration, Mr. Grimaldi stated as follows:

> It is my opinion, based on my experience in the field of auto mechanics and based on my familiarity with this make and model of vehicle and this engine, that a customer such as Mr. Carroll adding a quart of oil once a year for the second through fifth year of ownership is normal and well within specifications, and not an indication of a defect of any kind in said vehicle, nor was this any evidence of [an] excessive oil consumption issue in Mr. Carroll's vehicle.
>
> It is my opinion, based on my review of the repair records and the deposition excerpt, that Mr. Carroll's vehicle did not experience or exhibit an oil consumption defect within the warranty period.

[Filing No. 102-2 at 2 (numbering omitted).]

#### 2.  *Darren Manzari*[5]

Darren Manzari has worked in the automotive industry for 35 years.  [Filing No. 129-1 at 3.]  He has an Associate of Applied Science Degree in Automotive Engineering, is certified with

---

[5] BMW has moved to exclude Mr. Manzari's testimony.  [Filing No. 125.]  That motion is addressed below, and Mr. Manzari's opinion is summarized in full in this section.

the National Institute of Automotive Service Excellence as a Master Automotive Technician, and has been an "NYS Approved Automotive Instructor" since 1985.  [Filing No. 129-1 at 3-4.]  He opened his first independent repair facility in 1987, and subsequently opened two subsidiaries employing approximately 50 people and servicing 20-25 vehicles per day (6,000 vehicles per year).  [Filing No. 129-1 at 3.]  In 1998, Mr. Manzari began a training and consulting business, through which he provides automotive technical training and consulting to colleges, original equipment manufacturer dealerships, and aftermarket automotive facilities.  [Filing No. 129-1 at 3.]  He has experience with the N63 engine and is "familiar with its design, function and operation."  [Filing No. 129-1 at 6.]

Mr. Manzari's declaration states that his opinions are "based on [his] knowledge of internal combustion engines, along with [his] expertise in the analysis and diagnosis of customer complaints and vehicle performance."  [Filing No. 129-1 at 4.]  He states that in forming these opinions, he has reviewed numerous materials, including deposition testimony taken in this case; BMW's reports, measures, and service information bulletins; and service records, photographs, and videos of the Vehicle.  [Filing No. 129-1 at 4-6.]

Mr. Manzari offers five opinions on the issues involved in this case.  First, he opines that "N63 Engines suffer from a problem of defective valve stem seals."  [Filing No. 129-1 at 14.] Related to that opinion, Mr. Manzari concludes that BMW became aware of the N63 oil consumption problem in 2010, but "failed to document an accurate diagnosis of the defective valve stem seals until February of 2013." [Filing No. 129-1 at 14-15.]  Mr. Manzari states that BMW's specification that N63 engines can burn 1 quart of oil per 750 miles "is completely incorrect and too high for what is considered normal oil consumption, and, in [his] opinion, was adopted by BMW to avoid paying for costly repairs, such as the valve stem seal replacement in

the N63 Engine, and in other engines with known engine oil consumption problems." [Filing No. 129-1 at 15.]  According to Mr. Manzari, "[t]he majority of vehicles worldwide consume less than one quart per 7,500 miles, 10 times [the] specification BMW is trying to suggest is commonplace." [Filing No. 129-1 at 15.]  Mr. Manzari states that "[i]t is [his] opinion that the cause of excessive oil consumption in these N63 Engines is and always was due to defective valve stem seals." [Filing No. 129-1 at 15-16.]

Second, Mr. Manzari opines that BMW concealed from customers its knowledge that N63 engines suffer from defective valve stem seals.  [Filing No. 129-1 at 16.]  Specifically, he asserts that "[o]ver the course of approximately 2 years, BMW has changed its position from diagnosing and repairing manufacturing defects that cause excessive oil consumption to changing its position on what constitutes excessive oil consumption, all in an effort to avoid paying for costly repairs when replacing defective valve stem seals is involved." [Filing No. 129-1 at 16.]  Mr. Manzari states that despite knowing as early as February 2013 that defective valve stem seals cause excessive oil consumption, BMW concealed this fact by: (1) instructing dealers to tell customers that burning 1 quart of oil per 750 miles was "normal"; (2) instructing dealers to overfill engines with oil; (3) shortening the oil service interval; and (4) "discouraging its dealers from providing a customer with a record of an oil consumption complaint." [Filing No. 129-1 at 19-20.]

Third, Mr. Manzari opines that the Vehicle owned by Mr. Carroll suffers from defective valve stem seals, which BMW did not repair within a reasonable period of time.  [Filing No. 129-1 at 20.]  He asserts that photographs and video recordings of the Vehicle "show presence of oil inside combustion chambers and that spark plugs are fouled with oil," and show "smoke from the tailpipe when aggressively accelerating and decelerating the engine," which "[i]n [his] expert

opinion . . . indicate presence of oil in the engine's combustion chambers consistent with entry through the intake valves." [Filing No. 129-1 at 23.]  According to Mr. Manzari, "[t]he oil consumption exhibited by Mr. Carroll's BMW vehicle is excessive and in [his] expert opinion, demonstrates that the valve stems seals in his vehicle are defective." [Filing No. 129-1 at 23.] Further, Mr. Manzari states:

> The valve stem seals in Mr. Carroll's vehicle were defective when this vehicle was sold new. A valve stem seal is a type of seal that is designed to last the life of the engine. Valve stem seals are not a maintenance item and BMW's Service and Warranty Information Booklet provides no defined interval for servicing, maintaining, or replacing valve stem seals.

[Filing No. 129-1 at 23.]

Fourth, Mr. Manzari opines that the Vehicle "was not suitable for its ordinary purpose, which is providing safe and reliable transportation" because "when a vehicle consumes excessive oil, the driver runs the risk of running the vehicle too low on oil, causing major damage and/or becoming stranded." [Filing No. 129-1 at 23-24.]

Finally, Mr. Manzari opines that the value of the Vehicle is substantially reduced by its defective valve stem seals. [Filing No. 129-1 at 24.]  Specifically, "most buyers of these types [of] vehicles would not be willing or desiring to purchase vehicles which burned excess oil and/or required additional oil to be added to their engines between services." [Filing No. 129-1 at 24.]  According to Mr. Manzari, the cost to replace the engine and repair the oil consumption issue is approximately $12,500 to $15,000.  [Filing No. 129-1 at 24-25.]

### E.  The *Bang* Class Action

On September 18, 2015, a complaint was filed in the United States District Court for the District of New Jersey, commencing the case of *Bang v. BMW of North America, LLC*, Case No. 2:15-cv-6945.  [Filing No. 29 at 17.]  Mr. Carroll was a member of the putative class in that case,

but opted out of the class action settlement on August 10, 2018.  [Filing No. 29 at 17; Filing No. 89 at 20.]

### F.  This Lawsuit

Mr. Carroll filed his Complaint in this action on January 22, 2019.  [Filing No. 1.]  Mr. Carroll filed the operative Amended Complaint on June 19, 2019, alleging the following four claims: (1) breach of written and implied warranties pursuant to the MMWA; (2) breach of implied warranty of merchantability pursuant to the MMWA and Indiana Code § 26-1-2-314; (3) breach of express warranties pursuant to Indiana Code § 26-1-2-313; and (4) violation of the Indiana Deceptive Consumer Sales Act ("IDCSA"), Ind. Code § 24-5-0.5-1 *et seq.*  [Filing No. 29.]

BMW moved to dismiss the Amended Complaint, arguing that all of Mr. Carroll's claims were barred by the applicable statutes of limitations.  [Filing No. 35.]  The Court denied the motion, concluding that it could not determine based on the Amended Complaint alone that Mr. Carroll's claims were time-barred and writing:

> The statute of limitations issue is better dealt with by way of a motion for summary judgment, once an evidentiary record has been developed. To that end, the parties shall have 90 days from the date of this Order to conduct discovery into the statute of limitations issue. After the close of the 90-day period, Defendants shall have an additional 30 days to file a motion for summary judgment on the statute of limitations issue, if they determine that such motion is warranted. Although not provided for in the Case Management Plan, [Filing No. 24], the Court will permit a second motion for summary judgment, concerning the merits, to be filed later if necessary.

[Filing No. 48 at 15-16.]

BMW has now filed a Motion for Summary Judgment, arguing that all of Mr. Carroll's claims fail because there is no evidence that his Vehicle experienced an oil consumption issue and because all of the claims are barred by the applicable statutes of limitations.  [Filing No.

101.]  Mr. Carroll filed a Cross-Motion for Partial Summary Judgment, asking the Court to deny BMW's motion and enter judgment in his favor on BMW's statute of limitations defense.  [Filing No. 112.]  BMW filed a Motion to Exclude the Opinions and Testimony of Plaintiff's Expert, Darren Manzari ("Motion to Exclude").  [Filing No. 125.]  Mr. Carroll then filed a Notice of Supplemental Authority, [Filing No. 146], and BMW filed a Motion to Strike Plaintiff's Notice of Supplemental Authority, or In the Alternative, for Leave to File a Surreply ("Motion to Strike"), [Filing No. 148].  All of these motions are now fully briefed and ripe for the Court's decision.

### III.
### MOTION TO STRIKE

On April 22, 2021, after briefing was concluded on the summary judgment motions and the Motion to Exclude, Mr. Carroll filed a Notice of Supplemental Authority directing the Court to the Eastern District of Louisiana's decision in *Baker v. BMW of North America, LLC*, and attaching the written decision as an exhibit.  [Filing No. 146.]  In the Notice, Mr. Carroll pointed out that BMW moved in *Baker* for summary judgment and to exclude the testimony of an expert, and the *Baker* court denied both motions.  [Filing No. 146 at 1.]

On July 7, 2021, BMW filed its Motion to Strike, asserting that Mr. Carroll's "Notice of Supplemental Authority essentially presents additional argument to support his position as to the pending motions."  [Filing No. 148 at 1.]  BMW further argues that the *Baker* order has no bearing on this case because it was decided based on two issues of Louisiana law, which are different from the Indiana law that applies in this case.  [Filing No. 148 at 1-2.]  In the alternative, BMW asks that it be permitted to file a surreply, which is attached to the Motion to Strike, addressing the *Baker* order and two other issues that BMW contends were raised for the first time in Mr. Carroll's reply brief in support of his Cross-Motion for Partial Summary

22

Judgment—whether the Warranty is a warranty of future performance and whether DeFouw is a special or limited agent of BMW.  [Filing No. 148 at 2; *see also* Filing No. 148-1.]

In response, Mr. Carroll points out that BMW's Motion to Strike was filed nearly three months after the Notice of Supplemental Authority and nearly four months after Mr. Carroll's reply brief in support of his Cross-Motion for Summary Judgment.  [Filing No. 149 at 1-2.] Accordingly, Mr. Carroll argues, the Motion to Strike is untimely under Local Rule 56-1(d), which allows a party to file a surreply within 7 days after service of the reply brief.  [Filing No. 149 at 2.]  In addition, Mr. Carroll argues that his Notice of Supplemental Authority "is not making additional arguments, but rather brings to the Court's attention another court decision that involves substantially similar claims and defenses, which he may properly do."  [Filing No. 149 at 1.]  Finally, Mr. Carroll asserts that he argued in his initial brief that DeFouw was an agent of BMW, and that his argument regarding whether the Warranty is a warranty of future performance was in direct response to BMW's argument that it was not.  [Filing No. 149 at 2.]

In reply, BMW argues that Local Rule 56-1 does not apply because the Court "entered a briefing schedule which supplanted any automatic briefing schedule contained in the local rules[,] . . . differs from local rule 56-1[,] and does not contemplate a sur-reply."  [Filing No. 150 at 1.]  BMW asserts that Mr. Carroll has identified no authority that would permit him to file a notice of supplemental authority containing an out-of-state decision based on another state's law, and if the Court permits him to do so, it should permit BMW to respond.  [Filing No. 150 at 1-2.] Finally, BMW reiterates that it should be allowed to address in a surreply the arguments relating to future performance warranties and special agency, which BMW maintains that Mr. Carroll raised for the first time in his reply brief.  [Filing No. 150 at 2-3.]

To the extent that BMW seeks to strike Mr. Carroll's Notice of Supplemental Authority, BMW's motion is **DENIED**.  Although the Court is capable of finding and applying relevant caselaw to the matters before it, a party is permitted to direct the Court to potentially helpful authority that arose after the close of briefing.  *See, e.g., DeCrane v. Eli Lilly & Co.*, 2015 WL 6132905, at *5 (S.D. Ind. Oct. 19, 2015) (considering Plaintiff's Notice of Supplemental Authority).

To the extent that BMW seeks to file a surreply, its motion is **DENIED**.  The Court acknowledges BMW's position that *Baker* is not applicable to this case.  But the Court is capable of reading and evaluating the persuasiveness of the *Baker* decision in light of other existing authority.  In any event, the Court finds that the nearly 11 weeks between the filing of the Notice of Supplemental Authority and the Motion to Strike is an unreasonable delay that warrants denial of the motion.

As for BMW's request to be permitted to respond to arguments in Mr. Carroll's summary judgment reply brief, Local Rule 56-1(d) provides:

> A party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response. The surreply must be filed within 7 days after the movant serves the reply and must be limited to the new evidence and objections.

BMW's assertion that this Rule does not apply is incorrect.  Although BMW is correct that the briefing schedule ordered by the Court overrides the response and reply deadlines outlined in Local Rule 56-1(b) and (c), the Court's previous orders did not specifically address surreplies as discussed in Local Rule 56-1(d), and therefore that portion of the Rule remains in effect.  Furthermore, the circumstances addressed in that Rule are not present here.  Even if they were, BMW waited nearly four months after Mr. Carroll's reply brief was filed to attempt to file a surreply.  Not only does that expressly violate the Rule, but it is also entirely unreasonable.  In

any event, BMW's contention that Mr. Carroll did not raise the agency argument in his initial brief is without merit.  [*See* Filing No. 114 at 47-52 (discussing the agency relationship between DeFouw and BMW).]   And Mr. Carroll was permitted to respond in his reply brief to the argument raised in BMW's briefing regarding whether the Warranty constitutes a warranty for future performance.

In sum, BMW's Motion to Strike Plaintiff's Notice of Supplemental Authority, or in the Alternative, For Leave to File a Sur-Reply, [Filing No. 148], is **DENIED**.

### IV.
### MOTION TO EXCLUDE

#### A.  Standard of Review

Federal Rule of Evidence 104 instructs that "[t]he court must decide any preliminary question about whether a witness is qualified . . . or evidence is admissible."  Fed. R. Evid. 104(a).  Federal Rule of Evidence 702 provides that expert testimony is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  A trial judge "must determine at the outset…whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.   This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue….   Many factors will bear on the inquiry…." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993).

The Court has a "gatekeeping obligation" under Rule 702, and "'must engage in a three-step analysis before admitting expert testimony.   It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).   Put another way, the district court must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Gopalratnam*, 877 F.3d at 779 (emphasis omitted).   The Seventh Circuit Court of Appeals "give[s] the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011).

### B.  The Parties' Arguments

BMW argues that Mr. Manzari's testimony should be excluded because it does not meet the standards for expert testimony set forth in Federal Rule of Evidence 702 and *Daubert*. [Filing No. 126 at 1.]  BMW asserts that Mr. Manzari's opinions that the Vehicle has defective valve stem seals, that the defect caused the Vehicle to consume an excessive amount of oil, and that the defect existed when Mr. Carroll purchased the Vehicle are unreliable because: (1) the evidence shows that the Vehicle did not experience an oil consumption issue during the Warranty period, and adding one quart of oil per year is not an excessive amount; (2) Mr. Manzari is not an automotive design expert, and therefore is unqualified "to give opinions on automotive design pertaining to valve stem seals"; (3) Mr. Manzari provides no support for his opinion that BMW's oil specification of 1 quart per 750 miles is not normal or acceptable or that

the Vehicle's oil consumption was excessive; and (4) Mr. Manzari never inspected the Vehicle at all, let alone during the Warranty period.  [Filing No. 126 at 6-11.]  BMW also contends that it "simply does not follow" that because the warranty booklet did not list an interval for servicing or replacing valve stem seals, if those seals became defective at any point, they must have been defective since the Vehicle was purchased.  [Filing No. 126 at 11.]  BMW asserts that Mr. Manzari's conclusions are "speculative and insufficiently founded," mischaracterize the evidence, constitute nothing more than improper *ipse dixit* opinions, and are based on "made up facts."  [Filing No. 126 at 1-4; Filing No. 126 at 13-17; Filing No. 126 at 21-24.]  BMW also maintains that Mr. Manzari's opinion as to the cost of engine replacement is not credible and is irrelevant, and his opinion that BMW concealed knowledge of the alleged valve stem seal defect is an improper conclusion of law.  [Filing No. 126 at 17-21.]

Mr. Carroll responds that each of Mr. Manzari's opinions are reliable because they are based on his expertise in the field of automobile mechanics and his review of the relevant evidence.  [Filing No. 132 at 4-7.]  Mr. Carroll relies on a case from the Eastern District of Texas, *Harris v. BMW of N. Am., LLC*, 2020 WL 7318087 (E.D. Tex. Dec. 11, 2020), in which Mr. Manzari was permitted to testify as an expert.  [Filing No. 132 at 1; Filing No. 132 at 8.]  Mr. Carroll argues that Mr. Manzari does not opine that the excessive oil consumption is a result of a design defect, and regardless, the cases upon which BMW relies do not establish that only automotive design engineers may proffer opinions on vehicle defects.  [Filing No. 132 at 10-11.]  Mr. Carroll asserts that BMW's challenges to Mr. Manzari's opinions do not require exclusion, but can be addressed through vigorous cross-examination.  [Filing No. 132 at 13.]

In reply, BMW primarily reiterates its arguments that Mr. Manzari's opinions are based on "made up facts," are speculative, or are *ipse dixit* opinions based on no facts at all.  [*See* Filing

No. 141.]  BMW argues that Mr. Manzari's experience as a mechanic does not qualify him to opine on whether BMW knew of the alleged valve stem seal defect, and his conclusion that BMW concealed such defect is an *ipse dixit* opinion "based on his own subjective and flaw[e]d interpretation of [BMW's] internal documents."  [Filing No. 141 at 10-11-12.]

### C.  Whether Mr. Manzari is Qualified

Fed. R. Evid. 702 allows the opinions of witnesses who have the requisite "knowledge, skill, experience, training, or education."  The Seventh Circuit "has 'recognized that while extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.'"  *Trustees of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc*., 493 F.3d 782, 787-88 (7th Cir. 2007) (quoting *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005)).  Accordingly, the Court must "consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Trustees of Chicago*, 493 F.3d at 799 (quoting *Smith v. Ford Motor Co*., 215 F.3d 713, 718 (7th Cir. 2000)).

The Court finds that Mr. Manzari is qualified to testify as an expert concerning matters of automotive mechanics, engineering, diagnostics, and repair.  He has worked in the automotive industry for 35 years, has an Associates of Applied Sciences Degree in Automotive Engineering, and is certified as a Master Automotive Technician.  In addition, he has experience repairing and diagnosing vehicles and is familiar with the N63 engine.  BMW's argument that Mr. Manzari is not an expert in automotive design misses the point, given that his vast experience qualifies him to opine regarding the functioning of the Vehicle's engine.

28

### D.  Whether Mr. Manzari's Methodology is Sufficiently Reliable

The Supreme Court in *Daubert* set forth four factors a court may consider when determining whether an expert witness's methodology is reliable, including: (1) whether the methodology "can be (and has been) tested"; (2) whether the methodology "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; and (4) whether the methodology is generally accepted.  *Daubert*, 509 U.S. at 593-94.  These factors are not a "definitive checklist or test," *id*. at 593, and the weight of the factors is dependent on "the particular circumstances of the particular case at issue," *Kumho Tire Co., Ltd., v. Carmichael*, 526 U.S. 137, 150 (1999).  The key focus "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

Mr. Manzari reviewed a collection of documents relevant to this case, as well as photographs and videos of the Vehicle, and used his knowledge and experience to draw conclusions therefrom.  As a general matter, this is an acceptable and reliable methodology for experts.  *See Harris v. BMW of N. Am., LLC*, 2020 WL 7318087, at *4 (E.D. Tex. Dec. 11, 2020) (concluding that "Manzari utilized a reliable methodology in reaching his conclusion—namely, coupling his experience and knowledge with a review of various internal documents").

BMW challenges many of Mr. Manzari's various opinions, arguing that they are unreliable for a variety of reasons.  The Court need not expend the resources necessary to address each of these challenges specifically, because at this juncture it is sufficient that Mr. Manzari's opinion creates genuine issues of material fact concerning whether the Vehicle consumed an excessive amount of oil and, if so, when that issue arose and what may have caused

it.  As illustrated below, none of these matters are dispositive, and the Court can address the statute of limitations issues without deciding which party is correct in its position regarding the Vehicle's oil consumption.  Accordingly, the Court at this time declines to exclude Mr. Manzari's opinions related to matters of the Vehicle's mechanics or functioning.

The only opinion of Mr. Manzari's that is directly relevant to the statute of limitations issues that the Court must actually decide at this time is his contention that BMW fraudulently concealed from customers its knowledge that N63 engines suffer from defective valve stem seals.  Mr. Manzari's qualifications as an expert do not permit him to opine on this issue.

"Expert testimony must be helpful to the jury to be admissible."  *United States v. Christian*, 673 F.3d 702, 710 (7th Cir. 2012).  "[E]xpert testimony does not assist where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic."  *Id.* (alteration original) (internal quotations and citation omitted).  "In other words, a witness should not be allowed to put an 'expert gloss' on a conclusion that the jurors should draw themselves."  *Id.* (citation omitted).  *See also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("Expert testimony is permitted to assist the trier of fact with technical issues that laypeople would have difficulty resolving on their own. Expert testimony furthers this purpose only if the expert is in fact providing the jury with genuine expertise.").

The fact that Mr. Manzari may be an expert in the area of automobile mechanics does not entitle him to offer an opinion concerning whether the statement made by the unidentified Service Manager or BMW's actions as demonstrated by their internal documents amount to fraudulent concealment.  The facts relevant to this question—what BMW knew and when—do not require technical or specialized knowledge to be understood and are outside the scope of Mr.

Manzari's automotive expertise.  His opinion therefore is not based on any scientific methodology at all, and is merely a matter of his own speculation on a conclusion that can be drawn from the undisputed facts.  *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (expert testimony may not "be based on subjective belief or speculation"); *Smith v. Nexus RVs, LLC*, 472 F. Supp. 3d 470, 476 (N.D. Ind. 2020) ("Even if eminently qualified, experts cannot offer opinions based solely on their say-so (what lawyers call ipse dixit).").

Based on the foregoing, BMW's Motion to Exclude the Opinions and Testimony of Plaintiff's Expert, Darren Manzari is **GRANTED IN PART** and **DENIED IN PART** to the extent that the Court excludes Mr. Manzari's opinion that BMW fraudulently concealed from customers the knowledge of defective valve stem seals in N63 engines, but the Court declines to specifically consider or exclude all of his other opinions.

## V.
### SUMMARY JUDGMENT MOTIONS

### A.  Clarifying the Issues

BMW makes various arguments relevant to the merits of this lawsuit, beyond the statute of limitations issues.  It is true that some of these matters—such as whether the Vehicle had a defect and when—are intertwined with the statute of limitations analysis because, for example, BMW could not fraudulently conceal a defect that did not exist.  But, as demonstrated by the conflicting expert reports regarding oil consumption in N63 engines, several genuine issues of material fact exist that preclude the Court from reaching these issues at this stage in the litigation.  In an effort to streamline the disposition of this case, and in compliance with the summary judgment standard, which requires the Court to view the facts in the light most favorable to the non-moving party, the Court will make several assumptions in Mr. Carroll's

favor on issues raised in the parties' briefing.  For purposes of this Order only, the Court will assume without deciding that: (1) the Vehicle was defective from the time of purchase due to a problem with the valve stem seals; (2) the defect in the Vehicle caused it to consume an excessive amount of oil; and (3) DeFouw is an agent of BMW for purposes of warranty repairs, and therefore the statement made by the Service Manager is admissible and attributable to BMW.  The parties' arguments on these issues, and other arguments not directly relevant to the disposition of the remaining statute of limitations issues, will not be summarized or addressed further in this Order.  And, based on the version of the facts consistent with these assumptions, the Court will consider whether Mr. Carroll's claims are barred by the applicable statutes of limitations or whether any equitable doctrine permits him to assert those claims now.

### B.  The Parties' Arguments

As to the statute of limitations, BMW argues that Mr. Carroll's breach of written and implied warranty claims are barred by the four-year statute of limitations contained in Ind. Code. § 26-1-2-725 and his IDCSA claim is barred by the two-year statute of limitations contained in Ind. Code § 24-5-0.5-5.  [Filing No. 102 at 18-19.]  BMW argues that the single statement by the DeFouw Service Manager that the Vehicle's oil consumption was normal does not amount to fraudulent concealment or warrant equitable tolling.  [Filing No. 102 at 20-23.]  BMW also asserts that fraudulent concealment does not apply because Mr. Carroll was not diligent in detecting any alleged fraud or purported defect in the Vehicle, because he waited approximately 84 months after first adding oil to the Vehicle to notify BMW of the oil issue and never presented the Vehicle for service relating to an oil consumption complaint.  [Filing No. 102 at 25-26.]  BMW further argues that none of Mr. Carroll's causes of action are subject to a discovery rule, so that cannot be a basis for tolling the statute of limitation, and Mr. Carroll's

reference to class action tolling is a red herring because the statutes of limitation had already expired before the *Bang* class action was commenced. [Filing No. 102 at 26-27.]

In his brief in support of his Cross-Motion for Partial Summary Judgment and Response in Opposition to BMW's Motion for Summary Judgment, Mr. Carroll argues that BMW fraudulently concealed his cause of action by: (1) directing its dealers via internal documents to assure customers that excessive oil consumption was normal, despite having knowledge that there was a defect in the N63 engine; and (2) expressly telling Mr. Carroll (through the DeFouw Service Manager) that the Vehicle's consumption of oil was "normal." [Filing No. 114 at 52-57.] Mr. Carroll asserts that BMW had a duty to disclose that the oil consumption was not normal in order to correct its prior representation that it was normal, and because Mr. Carroll specifically inquired about the oil consumption issue. [Filing No. 114 at 53-55.] He argues that once he was told that the Vehicle's oil consumption was normal, he was not required to conduct any further investigation and could not have discovered that the engine was defective and required a repair. [Filing No. 114 at 55-57.] Mr. Carroll also contends that, pursuant to the discovery rule, his cause of action did not accrue until the vehicle began to smoke in 2017, at which time the *Bang* class action was ongoing and the statutes of limitations were further tolled pursuant to class action tolling. [Filing No. 114 at 57-58; Filing No. 114 at 61.] Mr. Carroll also argues that the doctrine of equitable estoppel applies to bar BMW from asserting a statute of limitations defense because BMW knowingly concealed the defect in the Vehicle and intentionally prevented Mr. Carroll from bringing his claims within the statute of limitations period. [Filing No. 114 at 58-60.]

In its Reply in Support of its Motion for Summary Judgment and Response to Mr. Carroll's Cross-Motion for Summary Judgment, BMW argues that Mr. Carroll's conversation

with the unidentified DeFouw Service Manager cannot constitute a breach of warranty, fraudulent concealment of the breach, and notice to BMW of the breach.  [Filing No. 124 at 24-26.]  BMW contends that the fraudulent concealment doctrine does not apply because: (1) there is no evidence that the unidentified Service Manager knew that Mr. Carroll was identifying an oil consumption issue or that he was aware of BMW's internal documents concerning that kind of issue; (2) the call to the Service Manager could not trigger a duty to disclose the defect or "correct the record" in the absence of evidence that BMW was on notice of the complaint or the Service Manager's response to it; and (3) Mr. Carroll did not exercise due diligence.  [Filing No. 124 at32-35.]  BMW further argues that Mr. Carroll's claims are not subject to a discovery rule, equitable tolling does not apply, and class action tolling does not apply because the *Bang* class action was commenced after the statute of limitations had already run.  [Filing No. 124 at 36-37.]

In his Reply in Support of his Cross-Motion for Partial Summary Judgment, Mr. Carroll reiterates his arguments that the statutes of limitations were tolled pursuant to the discovery rule and the doctrines of fraudulent concealment, equitable estoppel, and class action tolling.  [Filing No. 137 at 17-21.]

### C.  Applicable Statutes of Limitations

The MMWA "allows consumers to enforce written and implied warranties in federal court, borrowing state law causes of action."  *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004).  Where a federal statute does not expressly contain a statute of limitations, the Court generally will "borrow" a limitations period from an analogous state cause of action.  *North Star Steel Co. v. Thomas*, 515 U.S. 29, 33-35 (1995).  Because the MMWA does not contain its own statute of limitations, the Court will apply the Indiana breach of warranty statute of limitations to Mr. Carroll's breach of warranty claims under the MMWA.  *See id.*; *see also Highway Sales, Inc.*

*v. Blue Bird Corp.*, 559 F.3d 782, 789 n.6 (8th Cir. 2009) (concluding that, because the MMWA did not contain its own statute of limitations, the statute of limitations period for the plaintiffs' state law breach of warranty claims applied).   The Court will also apply the Indiana rules concerning tolling.  *See, e.g., Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) (explaining that, when the Court applies state law regarding the statute of limitations, it also applies the state law regarding "any rules that are an integral part of the statute of limitations, such as tolling and equitable estoppel").

Under Indiana law, the statute of limitations for a breach of warranty action is four years. Ind. Code § 26-1-2-725(1).  "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  Ind. Code § 26-1-2-725(2).  "A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered." Ind. Code § 26-1-2-725(2).

An action under the IDCSA must be brought within two years after the deceptive act.  Ind. Code § 24-5-0.5-5(b).  "Because the [IDCSA] has an occurrence statute of limitation, rather than a discovery statute of limitation, the statutory period commences to run at the occurrence of the deceptive act." *A.J.'s Auto. Sales, Inc. v. Freet*, 725 N.E.2d 955, 964-65 (Ind. Ct. App. 2000).

### D.  Discovery Rule

As noted above, the general rule is that a cause of action for breach of warranty accrues upon delivery of the goods, however, "if the express warranty guarantees the future performance of the goods, then the delivery rule changes to a discovery rule." *Kenworth of Indianapolis, Inc. v. Seventy-Seven Ltd.*, 134 N.E.3d 370, 377 (Ind. 2019) (discussing Ind. Code § 26-1-2-725(2)).

If the future-performance exception applies, "the cause of action accrues when the breach is or should have been discovered." *Kenworth*, 134 N.E.3d at 377.

"Because the future-performance exception applies in only narrow circumstances, courts interpret and apply the exception strictly." *Id.* And because the statute requires that a warranty must "explicitly" extend to the future performance of goods, most courts have held that implied warranties cannot explicitly extend to future performance. *Id.* "Consequently, courts will generally apply the future-performance exception to breach of express warranties only." *Id.*

"[A] warranty must contain three components to qualify as a future-performance warranty: (1) it must be an explicit promise or guarantee, (2) it must concern the characteristics of the goods themselves, and (3) it must identify a specific future time period during which the goods will conform to that guarantee." *Id.* at 380. The Indiana Supreme Court has expressly "reject[ed] the premise that [a seller's] duty to repair and replace defective goods alone constitutes a future-performance warranty," observing that "[t]he promise must explicitly extend to the goods' performance, not the sellers' performance, for a specific future time period," and explaining that a seller's "obligations to repair and replace defective materials and workmanship are better understood as a limited remedy . . . , not as a separate future-performance warranty and not as a separate promise." *Id.* at 379.

In *Kenworth*, the plaintiff trucking companies purchased a number of dump trucks from the defendant seller, with the following written warranty:

> Kenworth Truck Company warrants directly to you that the Kenworth vehicle ... will be free from defects in materials and workmanship during the time and mileage periods set forth in the Warranty Schedule and appearing under normal use and service.
>
> Your sole and exclusive remedy against Kenworth Truck Company and the selling Kenworth Dealer arising from your purchase and use of the vehicle is limited to the repair and replacement of defective materials or workmanship ... to

36

the extent of Kenworth Truck Company's obligations under the Warranty Schedule on the reverse side of this Agreement.

*Id.* at 374 (omissions original).  The *Kenworth* court concluded that the warranty constituted a future-performance warranty because: (1) "the phrase 'Kenworth Truck Company warrants directly to you' clearly qualifies as an explicit promise"; (2) "the promise relates to the quality or performance standards of the goods alone—the defect-free Kenworth truck"; and (3) "the parties identified a specific future time period for performance by using future-tense language ('will be free from defects' for 12-months/100,000-miles), rather than past-tense ('were free from defects') or present-tense language ('are free from defects')."  *Id.* at 380.  The court, however, emphasized the narrowness of its conclusion, writing:

> We stress that every word and phrase matters in these future-performance warranties. Adding, omitting, or changing a single word potentially alters the warranty's meaning and breadth. Had Sellers not used future-tense language, for example, or had they omitted a specific future time period for the trucks' quality and performance, or had they promised only to repair and replace defects rather than warrant against future defects, then this warranty would fall outside the limited future-performance exception. But as written, this bargained-for warranty constitutes a future-performance warranty, and the courts must apply the discovery rule to determine when the breach-of-warranty cause of action accrued.

*Id.* at 380-81.

The Warranty in the instant case is distinguishable from the one at issue in *Kenworth*. Although the Warranty contains an express promise (that BMW "warrants 2010 U.S. specification vehicles . . . against defects in materials or workmanship"), and that promise relates to the quality of the goods, the Warranty does not use future-tense language.  Instead, the Warranty refers to the present condition of the vehicles at the time of sale.  And although the Warranty specifically referenced a future date—four years or 50,000 miles—the Warranty did not provide that the Vehicle would be defect-free for that time.  Rather, the Warranty provided that replacement parts or repairs were covered during that time period.  In that sense, the

Warranty "promised only to repair and replace defects rather than warrant against future defects," and "fall[s] outside the limited future-performance exception." *See id.*

In sum, because the future-performance exception by definition cannot apply to Mr. Carroll's breach of implied warranty claims, and because the Warranty is not one for future performance, Mr. Carroll's warranty claims are not subject to the discovery rule. Thus, those causes of action accrued upon delivery of the Vehicle on April 15, 2010, and the statue of limitations began to run on that date. The same is true for his IDCSA claim, which has an occurrence statute of limitations that runs from the date of the alleged deceptive act, which in this case is the sale of the Vehicle. *E.g., State v. Classic Pool & Patio, Inc.*, 777 N.E.2d 1162, 1165 (Ind. Ct. App. 2002) (citing Ind. Code § 24-5-0.5-5(b); *A.J.'s Automotive Sales*, 725 N.E.2d at 965).

### E.  Fraudulent Concealment

The statute of limitations may be tolled if the defendant fraudulently conceals the action giving rise to liability. *Alldredge v. Good Samaritan Home, Inc.*, 9 N.E.3d 1257, 1261 (Ind. 2014); Ind. Code § 34-11-5-1 ("If a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action."). "The party alleging fraudulent concealment bears the burden to prove that tolling applies." *Gittings v. Deal*, 109 N.E.3d 963, 973 (Ind. 2018).

In order to show that the fraudulent concealment doctrine applies, the plaintiff must show that the cause of action was concealed until a certain time and "that either (1) the alleged wrongdoer actively concealed the cause of action and the claimant exercised due diligence to discover the cause of action, or (2) the parties' relationship—such as a fiduciary relationship—

imposed on the alleged wrongdoer a duty to disclose the cause of action to the claimant." *Gittings*, 109 N.E.3d at 973.  When a plaintiff makes the required showing of fraudulent concealment, "it effectively moves the date on which the statute of limitation begins to run forward from the date of the alleged tort to the discovery date." *Alldredge*, 9 N.E.3d at 1262.

Indiana law "narrowly defines concealment." *Ludwig v. Ford Motor Co.*, 510 N.E.2d 691, 697 (Ind. Ct. App. 1987).  The wrongdoer must have "actively concealed the cause of action," and such "affirmative acts of concealment must be calculated to mislead and hinder a plaintiff from obtaining information by the use of ordinary diligence, or to prevent inquiry or elude investigation." *Alldredge*, 9 N.E.3d at 1262 (internal quotations and citations omitted). "There must be some trick or contrivance intended by the defrauder to exclude suspicion and prevent inquiry." *Id.* (internal quotations and citation omitted).  Mere silence will not constitute concealment, absent a duty to speak arising from a fiduciary or confidential relationship.  *Id.*; *Ludwig*, 510 N.E.2d at 697.

Mr. Carroll points to two bases for applying the fraudulent concealment doctrine: (1) the statement by the DeFouw Service Manager that it was normal to have to add a quart of oil to the Vehicle; and (2) BMW's internal documents and reports.  Turning first to the Service Manager's statement, Mr. Carroll's position is that this statement was false because the Vehicle was consuming excessive engine oil due to a defect in the valve stem seals, which existed from the time of purchase.  There is no evidence to suggest, however, that BMW—or the unidentified Service Manager more specifically—knew in 2011 or 2012 that defective valve stem seals were a potential cause of excessive oil consumption.  Mr. Carroll's own expert acknowledged as much, opining that BMW knew "*as early as February 2013* that defective valve stems seals cause excessive consumption of engine oil." [Filing No. 129-1 at 19 (emphasis added).]  It cannot be

said that BMW—through the unidentified DeFouw Service Manager—actively and intentionally concealed a defect of which it had no knowledge at the time of the alleged concealment.

As for BMW's internal documents more generally, Mr. Carroll has not met his burden of establishing that those documents constitute active concealment of his cause of action. Even if it is assumed that BMW became aware of potential valve stem seal issues in vehicles with N63 engines in February 2013, BMW's internal documents demonstrate that such issue was only one of several potential causes of oil consumption. [*See* Filing No. 129-1 at 10 (Mr. Manzari's report, stating: "I agree with Mr. Murray that if the N63 Engine consumes excessive amount of oil but there are no external oil leaks and crankcase ventilation hoses and turbos are not leaking oil, then it suggests valve stem seals are defective and are in need of replacement.").] Nothing about the fact that BMW produced reports, measures, and bulletins addressing the various causes of oil consumption demonstrates that BMW actively concealed a valve stem seal defect from its customers, or from Mr. Carroll specifically, and there is nothing from which a factfinder could infer that BMW intended any "trick or contrivance." And Mr. Carroll has not demonstrated that a confidential or fiduciary relationship existed between him and BMW such that BMW had any duty to disclose a potential valve stem seal issue to him. *See Ludwig*, 510 N.E.2d at 697 (noting "the lack of a fiduciary relationship" between plaintiff buyer and defendant manufacturers).

Moreover, the undisputed facts demonstrate that Mr. Carroll did not exercise due diligence, which is a prerequisite for applying the fraudulent concealment doctrine. Mr. Carroll did not present the Vehicle to a dealership within the Warranty period for service, inspection, or repair related to oil consumption. He never mentioned the Add Oil Light or any related issue, or asked for any additional information about why oil consumption might or might not be "normal,"

during any of his various visits.  Accordingly, the doctrine of fraudulent concealment does not operate to toll the statutes of limitations for Mr. Carroll's claims.

### F. Equitable Tolling/Estoppel

"Indiana law allows for tolling a period of limitations under the doctrine of equitable estoppel." *Kenworth*, 134 N.E.3d at 383.  "This doctrine provides that if a party's actions prevent another party from obtaining the requisite knowledge to pursue a claim, then 'equity will toll the statute of limitations until the equitable grounds cease to operate as a reason for delay.'" *Id.* (quoting *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 690 (Ind. Ct. App. 2006)). "Equitable estoppel is typically linked to claims of fraudulent concealment, but the doctrine also applies to other conduct that 'lull[s] [a party] into inaction.'" *Kenworth*, 134 N.E.3d at 383 (quoting *Paramo v. Edwards*, 563 N.E.2d 595, 599 (Ind. 1990) (alteration original).  In order for equitable estoppel to apply, the defendant's conduct "'must be of a sufficient affirmative character to prevent inquiry or to elude investigation or to mislead and hinder.'" *Kenworth*, 134 N.E.3d at 383 (quoting *Paramo*, 563 N.E.2d at 599) (emphasis omitted).

The DeFouw Service Manager's statement and BMW's internal documents do not warrant the application of equitable tolling for the same reasons that they are insufficient to demonstrate fraudulent concealment.

### G. Mr. Carroll's Claims are Barred by the Applicable Statutes of Limitations

For the reasons articulated above, the statutes of limitations on Mr. Carroll's claims began to run upon his purchase of the Vehicle on April 15, 2010.  Because the Court concludes that no tolling principles apply, the two-year statute of limitations on Mr. Carroll's IDCSA claim expired on April 15, 2012, and the four-year statute of limitations on his other breach of warranty claims

expired on April 15, 2014.[6]   This action, filed on January 22, 2019, is therefore untimely. Accordingly, BMW's Motion for Summary Judgment is **GRANTED**, and Mr. Carroll's Cross-Motion for Partial Summary Judgment is **DENIED**.

## VI.
### CONCLUSION

Based on the foregoing, BMW's Motion to Strike Plaintiff's Notice of Supplemental Authority, or in the Alternative, For Leave to File a Sur-Reply, [148], is **DENIED**.   BMW's Motion to Exclude the Opinions and Testimony of Plaintiff's Expert, Darren Manzari, [125], is **GRANTED IN PART** and **DENIED IN PART** to the extent that the Court excludes Mr. Manzari's opinion that BMW fraudulently concealed from customers the knowledge of defective valve stem seals in N63 engines, but the Court declines to specifically consider or exclude all of his other opinions.   BMW's Motion for Summary Judgment, [101], is **GRANTED**, and Mr. Carroll's Cross-Motion for Partial Summary Judgment, [112], is **DENIED**.

Although the Court grants summary judgment in BMW's favor as outlined above, final judgment cannot yet issue because the claims against Defendant Bavarian Motor Works remain pending.   Mr. Carroll is **ORDERED** to **SHOW CAUSE** within **14 days** of the entry of this Order why Defendant Bavarian Motor Works should not be dismissed from this action with prejudice for reasons consistent with this Order.   Failure to respond by that deadline will result in dismissal of Defendant Bavarian Motor Works with prejudice.

---

[6] Mr. Carroll's arguments that the *Bang* class action or statements made by BMW during the course of that action toll the statute of limitations based on class action tolling or estoppel must be rejected, because the statute of limitations had already expired before those events took place. *See, e.g., Farmers Elevator Co. of Oakville v. Hamilton*, 926 N.E.2d 68, 80 (Ind. Ct. App. 2010) ("The conduct or misrepresentation upon which a plaintiff's claim of estoppel to assert the statute of limitations is based must occur prior to the expiration of the limitation period, not after the right of action has been barred by the running of the statute." (internal quotations and citation omitted)).

Date: 8/6/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**